308 A.2d 489.

.HOSPITAL SERVICE CORPORATION OF RHODE ISLAND *et al. v.*
ALBERT B. WEST, *Director of the Department of
Business Regulation, State of Rhode Island.*

AUGUST 10, 1973.

PRESENT: Paolino, Kelleher and Doris, JJ.

PAOLINO, J. The petitioners, Hospital Service Corporation of Rhode Island, hereinafter referred to as Blue Cross, and Rhode Island Medical Society Physicians Service, hereinafter referred to as Blue Shield, are nonprofit service corporations engaged in providing health care insurance to their subscribers. They brought this petition for certiorari under G. L. 1956 (1969 Reenactment) §42-35-16, as amended by P. L. 1972, ch. 169, sec. 30.[1] The petitioners, claiming that they are aggrieved by a final judgment of the Superior Court involving an appeal from a decision of the respondent, Albert B. West, Director of the Department of Business Regulation, filed this petition to review the action of that court.[2] We issued the writ, and pursuant thereto the pertinent records have been certified to this court.

Among the types of coverage provided by petitioners is the jointly underwritten Plan 65 which is designed to supplement the benefits afforded by the Federal Medicare program to those who are 65 years of age or older. On March

---

[1]General Laws 1956 (1969 Reenactment) §42-35-16, as amended by P. L. 1972, ch. 169, sec. 30, is the section of our Administrative Procedures Act which provides for review by this court of final judgment entered in the Superior Court in cases subject to the provision of that act.

[2]After the case was argued here, we, sua sponte, ordered the papers sent back to the Superior Court for entry of judgment *nunc pro tunc*. That having been done, the case is now in order for disposition.

28, 1972, petitioners, pursuant to the provisions of G. L. 1956 (1968 Reenactment) §27-19-6[3] and §27-20-6,[4] as amended by P. L. 1970, ch. 53, sec. 1, applied to respondent for an increase of $1.13 per month in Plan 65 membership rates for the rate year July 1, 1972 through June 30, 1973, a percentage increase of 15.75. The petitioners said in their application that such an increase was necessitated by increases in costs mandated by the Medicare program, over which costs petitioners had no control, and to provide a month's reserve.

Seymour A. Fenichel, a qualified actuarial expert in the field of health insurance, and Frank R. Adae, an executive vice president of Blue Cross, testified for petitioners at the

---

[3]General Laws 1956 (1968 Reenactment) §27-19-6, as amended by P. L. 1970, ch. 53, sec. 1, reads as follows:

"Rates charged subscribers.—The rates proposed to be charged by any corporation organized under this chapter to its subscribers shall be filed by such corporation at the office of the director of business regulation. Within thirty (30) days after receipt of such application, the director shall hold a hearing upon not less than ten (10) days' written notice prior to the hearing. Said notice shall contain a description of the rates proposed to be charged and a copy of such notice shall be sent to the applicant and to the Rhode Island consumers' council. At any hearing held hereunder, the applicant shall be required to establish that the rates proposed to be charged to subscribers are consistent with the proper conduct of its business and with the interest of the public. Any documents presented in support of a filing of proposed rates hereunder shall be made available for inspection by any party entitled to participate in a hearing provided hereunder at such time and at such place as the director may deem reasonable. The director upon such hearing, may administer oaths, examine and cross-examine witnesses[,] receive oral and documentary evidence. and shall have the power to subpoena witnesses, compel their attendance and require the production of books, papers, records, correspondence. or other documents which he deems relevant. The director shall issue a decision as soon as is reasonably possible following completion of the hearing. Said decision may approve, disapprove, or modify the rates proposed to be charged by the applicant."

[4]General Laws 1956 (1968 Reenactment) §27-20-6, as amended by P. L. 1970, ch. 53, sec. 1, is identical to §27-19-6, except that it applies to nonprofit medical service corporations.

hearing before respondent. Mr. Fenichel explained that Part A of Plan 65 protects its members from hospitalization costs to which they are exposed by the Federal Medicare program, while Part B serves the same function for physicians' fees. In supplementing Medicare payments during the 1971 calendar year, petitioners were obliged to pay the first $60 of a member's hospital bill and $15 daily for such confinement from the 61st day to the 90th day thereof. The self-executing provisions of the Medicare law increased the initial deductible to $68 with a consequent increase to $17 per day for the calendar year 1972. It was assumed that the minimal increase for 1973 would be $72, although other Blue Cross plans were estimating an increase to $76.

Under Part B petitioners must pay the first $50 of the subscriber's physicians' fees and 20 per cent of the balance. As charges and prices have risen in our economy the amount of dollars payable by petitioners has risen proportionately. Mr. Fenichel testified about the anticipated increase in physicians' fees and in the use of doctors and hospitals by the members. With regard to such fees and the additional costs expected in the handling of claims, the projected increase was limited by him strictly in accordance with federal regulatory provisions.

Mr. Fenichel pointed out that $6,281,422 was required just to meet claims and expenses. He then spoke about the reserves. As of July 1, 1972, he forecast a deficit balance in reserves of $56,868 making it necessary to add this amount to required income in order to bring the deficit balance to a zero position. In addition, to the extent that management wants to have prudent assurance against insolvency by virtue of experience, some degree of margin not in excess of projections is needed. On December 31, 1971, the total reserve position for Blue Cross alone was $4,979,000. He testified that reserves are only a matter of judgment and, having seen the practice of other Blue Cross

plans and being aware of the thinking of those concerned with the problem, it was his judgment that one month in reserve for Plan 65 was minimal. This amount of reserve was determined by the boards of directors of petitioners as necessary and reasonable. As a consequence, the sum of $523,452 (1/12th of total projected expenses) was included as needed income. To the resultant sum was added $27,323, the factor for direct pay-cycle loss—this resulted from the staggered billing cycle for contract holders under Plan 65. To acquire the total required income of $6,889,065, it was computed that the existing rate would have to be increased by $1.13 per month from $7.15 to $8.28 for the 1972-73 rate year. It appears that the total dollar increase in premiums under the projected rate amounts to $937,348, two thirds of which is designed to restore and rebuild reserves for this line of business.

Mr. Adae's testimony is in substance as follows. Prior to the advent of Medicare in 1966, premiums paid by members contained a factor which was allocated to direct-pay subscribers, part of which factor served to subsidize the large number of direct-pay elderly members. When Medicare began in 1966, the concept was that it had assumed the burden and responsibility for protection of the elderly. Medicaid by the state was also provided for elderly citizens who could not afford medical coverage. To avoid continued subsidizing of elderly citizens in light of the enactment of Medicare and Medicaid, the decision was made that Plan 65 should stand on its own. Mr. Adae also testified that basic Blue Cross and Blue Shield and Plan 65 were in competition with commercial companies.

Counsel for the Rhode Island Consumers Council was present at the hearing and participated therein. Evidence in opposition to the application was presented from representatives of senior citizens' groups. The substance of their testimony is that they opposed any increase in Plan 65

premiums because many of the elderly could not afford them.

In his decision respondent noted that the total dollar increase under the projected rate amounts to $937,348, two thirds of which was designed to restore and rebuild reserves for the Plan 65 line of business. It appears from the information presented at the hearing before respondent that of the $937,348 total proposed revenue to be produced by new rates, $607,643 was designed to increase Plan 65's reserve—its surplus—to a level deemed desirable by petitioner's boards of directors. Only the balance of $329,705 was designed to cover costs of increased patient benefits and higher administrative costs.

The respondent considered initially the portion of the rate request designed to produce sufficient premiums to meet the expected claims on a dollar-to-dollar basis. After discussing the projections made by the proposed plans, such as increase in membership, the increased number of claims, fee increases by physicians, and the claims handling expenses required by the plans to handle the increased enrollment and increased utilization, respondent noted that allowance of all of those items would raise the projected income of the plan from $5,951,000 to $6,281,000, and, barring any unforeseen occurrence, would keep Plan 65 on a self-sustaining basis.

The respondent then considered petitioners' requests for an additional $607,643 to eliminate the projected deficit and to create a one-month reserve for this separate line of business. After discussing the testimony presented by petitioners' witnesses on the need for reserve in order to meet unforeseen contingencies, to give the claims greater viability and flexibility and to insure the solvency of the plans, he pointed out that the law charges him with the duty of determining that the rates are consistent "with the proper conduct of its business and with the *interest of the pub-*

*lic.*" Then after referring to the testimony given by various representatives of senior-citizen groups and after noting that unless rate increases are kept at an absolute minimum, increasing numbers of elderly will be forced to resort to various welfare agencies, he concluded that

> "* * * granting premium increase beyond that which is absolutely essential to put this program on a pay-as-you-go basis would not be consistent with the interests of the public. In addition, the actuary for the plan conceded that Blue Cross and Blue Shield overall presently enjoy substantial reserves and that in view of such status, there was no real risk of insolvency to the plans that would ensue merely because Plan 65 did not have its own separate reserve fund. This filing effects only about 9% of the total membership of the plan. According to its own filing, in all of '71, it spent less than $5,000,000., and according to Mr. Fenichel, the Blue Cross alone has greater than that amount in overall reserves."

He stated that the requested 15.75 per cent increase was not consistent with the interests of the public and, accordingly, he rejected such an increase and reduced the requested increase to 5½ per cent, an amount sufficient only to place the plan on a pay-as-you-go basis. The new monthly premium approved was $7.55 rather than the requested $8.28.

On June 1, 1972, petitioners filed a complaint in the Superior Court under §42-35-15, seeking judicial review of the decision entered by respondent. Pursuant to Super. R. Civ. P. 24(a), the Rhode Island Consumers' Council and Margaret E. Maguire, a member of Plan 65, gave notice of their intervention in this action. The review was conducted by a justice of the Superior Court without a jury and was confined to the record of the proceedings before respondent. Section 42-35-15(f).

The trial justice, after discussing and reviewing the evidence presented to respondent and the opposing conten-

tions of the parties present at that hearing, said that a choice between those opposing contentions did not have to be made. After noting that the intervenor, Maguire, took the position that petitioners had failed to meet statutory requirements, he held that on this record that position was sound. In affirming respondent's decision the trial justice said:

> "Sections 27-19-6 and 27-20-6, General Laws of Rhode Island, 1956, 1969 Reenactment, require the defendant to conduct a hearing whenever the plaintiffs propose to change the rates charged to subscribers. At that hearing it is incumbent upon the plaintiffs to establish that the rates proposed to be charged are consistent not only with the proper conduct of their businesses but also with the interest of the public. The record here is devoid of evidence that the filing is consistent with the public interest. It does appear that in 1966 the plaintiffs determined that equitable considerations required Plan 65 to stand on its own, free of subsidization by other plans. But while such management judgment may have been valid then, nothing was put before the defendant which would permit him to conclude that such a judgment comports with the public interest now. While the plaintiffs complain that the defendant has substituted his judgment for theirs, they failed to disclose to him what consideration they gave, if any, to the interest of the public in proposing this rate increase. So far as can be discerned, they did not take that issue into account. Their evidence bore solely upon whether the increase was consistent with the proper conduct of their businesses. That is not enough to sustain their burden."

With respect to intervenor Maguire's request for reversal of respondent's decision, the trial justice stated that §42-35-15(g) empowers the court to reverse respondent's decision "if substantial rights of the appellant have been prejudiced," but he pointed out that Maguire was not an appellant here. He then affirmed the decision of respond-

ent. The petitioners thereupon filed this petition for certiorari to review the action of the Superior Court.

## I

The petitioners argue that the trial justice's affirmance of respondent's decision is erroneous. Their first claim is that implicit in the decision of the trial justice and of respondent is a mandate by the latter that the separate reserves of other contracts provided by petitioners to other groups of subscribers (basic Blue Cross, Major Medical, basic Blue Shield and Blue Shield Plan 100) support another group of subscribers, namely, those having the jointly underwritten Plan 65; and that nothing in the controlling statutes authorizes the director to decide that one segment of the public shall support another segment of the public. They further argue that the clear implication of the statute is that the rates charged for any particular contract shall be fairly related to the services provided and not discriminatory; that nothing in the Blue Cross or Blue Shield acts authorizes either the corporations themselves or the Director of Business Regulation unfairly to discriminate as to the several groups which make up "the public"; that under the decision of respondent and of the trial justice, Plan 65 deficits for the year ending June 30, 1972, must be charged against the reserves of other Blue Cross and Blue Shield Plans and if there should be further losses, they must be similarly charged against such other reserves; and, finally, that this constitutes unfair discrimination against the other plans and amounts to the imposition of a confiscatory rate upon petitioners' other lines of business.

On this record we cannot pass on petitioners' claim of unfair discrimination and confiscatory rate. We do not know, and we cannot determine, how the rate set by respondent unfairly discriminates against subscribers in the other plans because those plans were not presented by the

petitioners. The case before us involves only the filing for a rate increase for Plan 65.

It seems to us that the decisive issue here is whether or not the trial justice erred in ruling that respondent did not act unlawfully, arbitrarily or clearly erroneously in finding that petitioners failed to sustain their burden of proving that the proposed rate increase was consistent with the interest of the public.

The petitioners contend that there is substantial evidence that the proposed increase was "in the interest of the public." They argue in substance that much of the same evidence that satisfies the "proper conduct" of the business standard would satisfy the "interest of the public" standard. In support of their argument that they had met their burden under §§27-19-6 and 27-20-6, they point to the evidence introduced by them establishing the accuracy of their revenue and expense figures. In addition petitioners state that the evidence demonstrated that segregation of reserves, which had been mandated by a former Director of Business Regulation, was a reasonable course of action and an entirely appropriate policy direction to be chosen by the boards of both corporations, acting jointly. Further, they argue, the evidence showed that the boards had acted prudently and in a nondiscriminatory manner in establishing segregated reserves.

Finally, petitioners argue, the decision of their boards to segregate reserves based on different lines of business and different risks is reasonable and equitable and within management's prerogative and, therefore, it was error for the trial justice to interfere with their action.

We address ourselves first to the question of whether petitioners have sustained their burden of proving that the rates proposed to be charged are consistent with "the interest of the public." The substance of petitioners' argument is that the question of whether separate reserves should be

maintained for each line of business and the amount of such reserves is a matter of sound management discretion; that once the boards of directors have resolved the question in a manner consistent with the proper conduct of their business, that resolution is also, ipso facto, consistent with the public interest. In short, petitioners argue that proof of one standard is automatically proof of the other. We cannot agree.

The express language of §§27-19-6 and 27-20-6 negates petitioners' argument. Those sections provide:

> "At any hearing held hereunder, the applicant shall be required to establish that the rates proposed to be charged to subscribers are consistent with the proper conduct of its business and with the interest of the public."

Those sections further provide:

> "The director shall issue a decision as soon as is reasonably possible following completion of the hearing. Said decision may approve, disapprove or modify the rates proposed to be charged by the applicant."

The language in the quoted sections clearly states that an applicant has the burden to establish that the proposed rates are (1) consistent with the proper conduct of its business and (2) with the interest of the public. If the Legislature intended that proof of consistency with the proper conduct was to be synonymous with proof of consistency with the interest of the public, it would have said so. We agree with the statement of Rhode Island Consumers' Council that adoption of petitioners' position by this court would substantially deregulate the establishment of Blue Cross-Blue Shield rates and would reduce the Director of Business Regulation's function to ascertaining the mathematical accuracy of rates already determined to be appropriate by the applicants' boards of directors and actuaries. This would deprive the director of the power to regulate rates to protect public interest and would be contrary to the spirit and language of §§27-19-6 and 27-20-6,

which expressly vest him with power to "approve, disapprove, or modify" the proposed rates.

The trial justice found that petitioners failed to disclose to respondent what consideration they gave, if any, to the interest of the public in proposing this rate increase; that so far as could be discerned, they did not take that issue into account; and that their evidence bore solely upon whether the increase was consistent with the proper conduct of their businesses. He concluded that this was not enough to sustain their burden. On this record we cannot say that his findings were clearly wrong and therefore we do not disturb them. Having failed to sustain the burden placed on them by the pertinent statutes, it follows that petitioners were not entitled to the rates requested by them.

## II

This leaves us with the question of whether the trial justice erred in affirming respondent's action in approving an increase of 5½ per cent. The petitioners argue that the decision by their boards of directors to segregate reserves based on different lines of business and different risks was reasonable and equitable and within management's prerogative and that, therefore, the trial justice's decision affirming respondent's interference with their action is erroneous. The petitioners cite several cases from other jurisdictions to support their argument that the establishment of the kinds and amounts of reserve is purely a management prerogative. They appear to rely to a great extent on certain language in our decision in *United Transit Co.* v. *Nunes*, 99 R. I. 501, 512-13, 209 A.2d 215, 222 (1965), where we said:

> "Ordinarily, the determination of what shall be expended in the areas under consideration is a function of management and should not be interfered with absent evidence tending to prove that the projected

expenditures unreasonably and unjustly affect the fare-paying public. (cite omitted) While the Company may owe an obligation to the fare-payers 'to pare these expenses as the system shrinks,' a conclusion that they are unreasonable and unjust grounded solely on that reason constitutes an invasion of the office of the Company's board of directors and an unwarranted invasion into the field reserved to management.

"For the reasons indicated, we hold that the administrator acted arbitrarily when he deducted $25,000 from the estimated general and administrative expenses and a remand is required. The administrator in any supplementary decision should advert to circumstances in addition to the Company's contracting operations which lend support to the conclusion that the estimated expenses in these areas are unreasonable."

It is true that in that case we held to be arbitrary the disallowance by the Public Utilities Administrator of a certain amount in operating expenses, but we pointed out that we did not question the administrator's authority to determine that the estimated expenses in the areas under consideration were unreasonable. *Id.* at 512-13, 209 A.2d at 222. The governing statutes in the case at bar require the applicants to establish the consistency of their proposed rates with the interest of the public. Here respondent found that "* * * granting premium increase beyond that which is absolutely essential to put this program on a pay-as-you-go basis would not be consistent with the interests of the public." This is in effect a finding by respondent that the action of the boards of directors in setting up a separate reserve for Part A and in proposing a rate based thereon was arbitrary and unreasonable. Under §§27-19-6 and 27-20-6, the Director of the Department of Business Regulation is charged with the duty of determining, independent of the applicants' board of directors, whether the proposed rates are consistent with the interest of the public. On this record, keeping in mind that two thirds

of the proposed revenue would not be dedicated to patient service for the indefinite future, we cannot say that the trial justice erred in affirming respondent's action.

In view of the fact that the case at bar is governed by specific statutes we do not deem it necessary to discuss the cases from other jurisdictions which have been cited by petitioners. We do point out, however, that petitioners have cited no authority which bars a regulatory agency from interfering with the action of a board of directors in a case such as this, which is found to be arbitrary, unreasonable or capricious.

### III

We come finally to petitioners' argument that if §§27-19-6 and 27-20-6 are construed to permit the Director of the Department of Business Regulation to override their boards of directors' policy determinations with respect to reserves, then the statutes would deny petitioners the equal protection of the laws in violation of the fourteenth amendment to the Constitution of the United States. The basis of their claim is that Blue Cross and Blue Shield compete with commercial insurers, both as to their basic lines of business and Plan 65, and that the statutes of this state do not confer upon the director authority to direct commercial carriers to operate lines of business at a deficit and without reserves nor permit him to overturn management's policy decisions made within a range of reasonableness. They argue further that there is no reasonable basis to permit the director such extraordinary powers to overturn reasonable management decisions by their boards, and not subject competing commercial insurers to similar restrictions. They conclude by arguing that §§27-19-6 and 27-20-6 should be interpreted in such a manner as to avoid such an unreasonable discrimination.

We find no merit to any of petitioners' arguments on this issue. Sections 27-19-6 and 27-20-6 do not deprive peti-

tioners of equal protection of the laws. Nor do those sections result in an unreasonable discrimination.

The equal protection clause of the fourteenth amendment guarantees equality of treatment to all similarly situated but, as this court pointed out in *Beebe* v. *Fitzgerald*, 106 R. I. 650, 654, 262 A.2d 625, 627 (1970), it

> "* * * permits a classification which is reasonable and not arbitrary, and which is based upon substantial differences having a reasonable relation to the objects or persons dealt with and to the public purposes sought to be achieved by the legislation under scrutiny. Equal protection does not require that all persons be dealt with identically. It does, however, require that the distinction drawn have some relevance for which the classification is made."

A mere reading of the pertinent statutes shows clearly that there are substantial differences between the protection afforded by Blue Cross-Blue Shield and that of competing commercial carriers. There is also a substantial difference between the purposes and objects sought to be achieved by the statutes authorizing the creation of nonprofit hospital and medical service corporations and those authorizing the organization of commercial carriers. Indeed, as we pointed out in *Hospital Service Corp.* v. *Penn. Ins. Co.,* 101 R. I. 708, 717, 227 A.2d 105, 111 (1967), a corporation organized under ch. 19 of title 27 is not part of the insurance industry.

Because of the substantial differences between nonprofit hospital and medical service corporations and commercial insurance carriers the Legislature, in the exercise of the police power, may classify nonprofit corporations such as petitioners as separate from commercial insurers and may confer upon an administration officer the right reasonably to regulate the affairs of such corporation. *Associated Hospital Service of Maine* v. *Mahoney,* 161 Me. 391, 213 A.2d 712 (1965).

All of us are aware of the public need for adequate medical benefits which are supplied at a cost the average wage earner can afford. *California Physicians Service* v. *Garrison,* 28 Cal.2d 790, 172 P.2d 4 (1946). The two-pronged test found in §27-19-6 is designed to guarantee that that public need will continue to be served.

The petitioners in challenging §27-19-6 on the basis of a denial of equal protection had to show the General Assembly's choice of criteria was "palpably arbitrary." *Imperial Car Rental Corp.* v. *Lussier,* 97 R. I. 168, 196 A.2d 728 (1964). This they have failed to do.

The petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the papers are remitted to the Superior Court for further proceedings.

Petition to reargue denied.

Mr. Chief Justice Roberts and Mr. Justice Joslin did not participate.

*Tillinghast, Collins & Graham, Edwin H. Hastings, Peter J. McGinn,* for petitioners.

*Roberts & Willey Incorporated, Dennis J. Roberts II,* for Rhode Island Consumers' Council; *S. Everett Wilkins,* for Margaret E. Maguire, intervenor.