[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
These two cases are appeals by the Attorney General from decisions of the Director of Business Regulation ("the Director") raising the rates of direct pay subscribers (Class DIR) to Blue Cross and Blue Shield of Rhode Island ("Blue Cross") in 1989 and 1990. The Court revisits terrain it surveyed in 1988. See,Blue Cross Blue Shield of Rhode Island v. Mark A. Pfeiffer,Director, C.A. No. 86-2599, decision filed October 13, 1988. This appeal involves only Class DIR subscribers. Class DIR subscribers are persons who pay directly, and not as members of groups, for individual or family coverage under various programs offered by Blue Cross. Most of them are persons who converted from group subscriptions to direct pay subscriptions.
On April 28, 1989, Blue Cross requested, among other things, that the Director approve rate increases amounting to approximately 37% for Class DIR Pool I and Pool II subscribers, a rate schedule for an optional new benefit program for Class DIR subscribers to be known as "Economy Option", and the incorporation of its Managed Benefits Program in the coverage for all Class DIR subscribers. In 1988 the Director had approved the division of Class DIR subscribers into Pools I and II. Pool II subscribers would be generally eligible for a reduced rate schedule based on considerations not pertinent to this appeal. The "Economy Option" was claimed by Blue Cross to provide "a basic level of protection with cost sharing by the subscriber at subscription rates substantially below those filed for the full comprehensive program of benefits that continue to be available to direct pay subscribers". The "Managed Benefits Program" was designed to reduce or control in-patient days by subscribers at a small added component for administration cost. The application was amended on May 12, 1989 to reflect a change in a proposed administrative charge for the Managed Benefits Program from $1.40 per contract month to $1.00 per contract month.
After public hearings as required by law on June 15, 16 and 21, 1989, the Director on August 16, 1989, approved the requested increases in rates for Class DIR and STU programs, but modified to reflect a reduced contribution to reserve of two percent (2%) effective September 1, 1989. He also approved the concept and rates for the "Managed Benefits Program" and the "Economy Options" for Class DIR.
Once again, on May 4, 1990, Blue Cross requested rate increases for both Class DIR Pools I and II and Class STU effective September 1, 1990. As in 1989, Blue Cross also requested approval for rates for "Economy Options" and for the "Managed Benefits Program" for Class DIR subscribers. Public hearings were held on May 29 and 30, 1990, resulting in a decision by the Director on August 17, 1990, approving all of the requested increases, modifying the contribution to reserve to two percent (2%) instead of the four percent requested.
Because the same issues are involved in both appeals, the parties have filed consolidated memoranda and have requested a consolidated decision. After a careful review of the record in both rate proceedings, the Court is satisfied that these actions ought to be consolidated and the decision will be the same in each case.
I.
OPERATING EXPENSES
The Attorney General challenges the Director's finding that Blue Cross' projected total incurred claims and operating expense figures for each plan: Basic Hospital, Basic Surgical/Medical and Major Medical, for each year were acceptable as accurate. See,Finding of Fact No. 20, Department of Business RegulationDecision In Re: Petition of Blue Cross Blue Shield of RhodeIsland for Increased Rates for Classes DIR and STU, adopted and accepted August 16, 1989 (hereinafter "1989 Decision") andFinding of Fact No. 22, Department of Business RegulationDecision In Re: Petition of Blue Cross Blue Shield of RhodeIsland for Direct Payment and Student Plans, adopted and accepted August 17, 1990 (hereinafter "1990 Decision"). He argues that the methodology Blue Cross used to predict operating expense was flawed, that the increases requested for this expense item were so great as to be per se unreliable, and that Blue Cross had demonstrated a lack of control over its administrative expenses.
It is very difficult to understand the legal basis for this attack on the Director's decisions. The question of whether or not a projected expense to be included in a rate basis is reasonable seems to be purely a question of fact. This Court's jurisdiction to review administrative fact-finding is tightly circumscribed. The Court is not permitted to substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. G.L. 1956 (1988 Reenactment) §42-35-15(g); Costa v. Registrar of Motor Vehicles, 543 A.2d 1307
(R.I. 1988). Where there are conflicting expert opinions on matters of fact, peculiarly within the agency's special jurisdiction, the Court should not interfere with the agency's credibility decision. Mendonsa v. Corey, 495 A.2d 257, 263 (R.I. 1985). Of course, the Court may reverse or modify an administrative decision which is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. § 42-35-15(g)(5); Costa v. Registrar of MotorVehicles, supra.
Blue Cross proposed and the Director accepted a simple, unsophisticated and straightforward method to predict the operating expense component of the incurred claims and operating expense element of its requested rates. For 1989 Blue Cross took the 1988 historical Class DIR ratio of total incurred claims expense to the total incurred claims expense and operating expense for Class DIR in that year, and used that ratio as the basis to project operating expense for the rate year. Blue Cross assumed that the 1988 ratio would be maintained in 1989. 1989Decision, Finding of Fact No. 19. In 1990 Blue Cross departed somewhat from its 1989 method. Instead of using the 1989 ratio, Blue Cross chose to continue using the 1988 ratio. It contended, and the Director accepted, that the 1989 ratio was distorted by a non-recurring expense. It is noteworthy that the Director accepted the base-year ratio method of prediction in 1990 only with great reluctance. He pointed out: "The method used by Blue Cross tends to allow administrative expenses to increase in concert with health care expense. A more desirable method would justify expense charges on their own merits, independent of increases in health care costs . . . Blue Cross is encouraged to adopt a more accurate method in future rate requests." 1990Decision, Finding of Fact No. 21.
Mr. Ronald A. Battista, executive vice president of Blue Cross, who qualified at the 1989 hearing as an expert witness on Blue Cross operational policy, testified for Blue Cross through a written pre-filed statement, dated April 28, 1989 received in evidence at the 1989 hearing as Blue Cross Exhibit 19. His testimony regarding projected increases in operating expenses appears at pages 19 through 21, inclusive, of the exhibit. He testified that the method used had been approved by the defendant for the last Class DIR filing in 1988, and had turned out to prove accurate, "since the actual increase in 1988 was within 1% of the projected increase using this method." It was his opinion that "this method is very conservative and results in a fair projection of operating expense." He gave two reasons for this conclusion:
 "First, Class DIR's cost per claim compares favorably with other direct pay plans. Secondly, to put this element of rate relief in its proper context, of the requested 35.56% increase for Pool I (Semi-Private Hospital Plan, Plan 100, Major Medical), 10.69% is caused by present rate inadequacy, 17.92% is caused by projected price and utilization increases, and only 1.36% is caused by the operating expense increase."
The application of this ratio also has the virtue of simplicity, according to the witness, so that rate-setters are spared the time consumed by "forays" into cost allocation and related issues. The causes of the increase in this expense, according to the witness, are the loss of the CHAMPUS contract and cost of "new processes and procedures and to stay abreast of technological changes necessary to provide the services as promptly and efficiently as possible."
The witness was intensively cross-examined on the subject of operating costs by counsel for the Attorney General.Transcript, Department of Business Regulation Proceedings atHearing In Re: Blue Cross and Blue Shield Direct Pay RateFiling, June 15 and 16, 1989, pp. 127-147; 150-152 (hereinafter, "1989 Transcript.") When asked why the loss of the CHAMPUS contract in 1988 did not result in a reduction in operating costs, the witness explained that, while Blue Cross did substantially reduce the overall number of employees, it nevertheless tried to retain employees formerly servicing CHAMPUS to fill regular recurring vacancies in other programs and to service new programs such as managed benefits. Id., pp. 131-34. When challenged to explain increasing costs in spite of decreasing enrollment, the witness pointed out that Blue Cross was providing new administrative services and that even with declining enrollment the number of claims was increasing. Id.,
pp. 140-43. The witness contended that using a ratio based on the previous year's claims and operating expenses was conservative because it does not reflect increased services provided by the company in the year of projection. Id., p. 151.
Mr. Michael J. Recorvits, an assistant vice president of Blue Cross for actuarial services, was permitted to testify as an expert in the area of health insurance ratemaking for Blue Cross, although he was not a board certified actuary as an associate or fellow of the Academy of Actuaries. His pre-filed testimony, dated April 28, 1989, was received as Blue Cross Exhibit 1. Documents referred to in his testimony were received as Blue Cross Exhibits 2 thru 18, inclusive. His explanation of the method of calculating projected operating expenses for the various plans available to Class DIR subscribers appears at page 29 of his pre-filed testimony explaining Column (3) Operating Expense in Schedule 4 (Basic Hospital Plan), Schedule 11 (Basic Surgical/Medical Plan,) and Schedule 19 (Major Medical), which show the calculation of rate change factor for each plan for Classes DIR Pool I and STU. He gives two bases for the use of the ratio: "It is consistent with methodology presently used and approved for Classes IER and PER (large and small groups) and is identical to the method used and approved in the prior Class DIR filing. For calendar year 1988, our projection in the last filing was within one percentage point of actual operating expenses of Class DIR." At page 60 of his testimony in a table the witness shows that Blue Cross is requesting a 35.6% increase over its then present rates. Another table at page 62 explains that 1.36% of the total increase of 35.6% is attributable to increased operating expense. On cross-examination the witness defended the methodology on four grounds: first, it is a commonly-used technique in ratemaking; second, it had been approved in the previous year's filings; third, it was consistent with the previous method; and fourth, it was reasonable. 1989Transcript, pp. 288-89.
The Attorney General offered the testimony of Ronald Becker, whose qualifications were accepted by all parties and the Director. Mr. Becker vigorously opposed the method used by Blue Cross to project the operating expense component of the rates for all the plans offered to Class DIR subscribers. 1989Transcript, pp. 354-362. He argued that direct pay consumers, equally with group coverage purchasers, have a right to know what specific items are included in the costs attributable to their contracts, so that they can try to get specific items excluded or changed. Id., pp. 355-56. He characterized the use of a ratio derived from a previous year's expenses as "inappropriate," and should be changed. Id., p. 356. He objected that Blue Cross' method did not require any items of expense to be justified.Id., p. 357. He argued that just because an expense was in the data base in one year is not sufficient justification to carry in the next. Id. He questioned the choice of 1988 as a base year, in view of the fact that there was a major change in Blue Cross' operation with the loss of the CHAMPUS contract. Id., p. 358. Also he objected to relating operating expense to claims experience which is subject to different and generally greater inflationary pressures. Id., p. 359. He disputed the claims that the method had demonstrated its own accuracy. Id., p. 360. He recommended a return to a previous practice of limiting changes to operating cost or controlling them by index numbers, similar to the reported consumer price index for wage earners.Id., p. 361-62. He concluded his opinion on this issue: "I think possibly last year's rates plus an increase in (the) range of maybe five to 10 percent would probably be more justified unless there's a more detailed study made to determine what a real proper increase would be." Id., p. 362.
The law cannot require that a ratemaker's projection of future expenses be perfect. That standard is never reached by mere mortals. Nor can we require only the best. One person's best may be another's second or third best. Nor should we require for the same reason that a projection be better than average. The law requires only that such a projection have some basis in reason and not be randomly selected, such as the Attorney General's suggestion of an increase of "approximately five to ten percent", a range of one hundred percent, unrelated in any way to any historic data. There very well may be a better way to estimate projected operating expenses attributable to a particular class of beneficiaries and ratepayers. Even much, much better. The Director, however, should not be faulted for approving a projection which has some relation to historic data and some, even if slight, predictive power.
The Director's finding with regard to the projected total incurred claims and operating expense for each plan for Class DIR and STU subscribers in the 1989 Decision is supported by substantial competent evidence considering the record as a whole, and will not be set aside.
In the 1990 hearings the testimony of Mr. Ronald A. Battista was pre-filed, as in 1989, in the form of a written question-and-answer statement dated May 4, 1990 and received as Blue Cross Exhibit number 19. Mr. Battista discussed operating cost expense at pages 25 thru 29 of his pre-filed testimony. He first testified that Blue Cross ranked 25th in costs per claim out of 57 reporting plans. The method used for projecting increases had been approved for Classes DIR and STU in two previous Class DIR filings and had been used and approved for Classes IER (Individual Experience Rated Groups) (large) and PER (Pooled Experience Rated Groups) (small). Blue Cross used the ratio of total incurred claims expense to the total combined incurred expense and operating expense as actually measured in 1988 as the basis for projecting operating expense in the 1990 rate year. The ratio equals .9483. Once incurred claims expense for the rate year is projected it is divided by .9483 to yield a total combined expense, and the difference becomes the projected operating expense for the rate year. Projected operating expenses thereby rise and fall in lock-step with the dollar amount of projected incurred claims, not the number of claims, subscribers or any other factor or combination of factors which may be vectors bearing on changes in operating expenses. Underlying the use of that ratio is an assumption described by the witness as follows: "The assumption is that a proportionate relationship of historical operating expense to increase in claims expense would be maintained during the rate year." In the 1989 hearings that assumption was validated by the fact that when the 1987 historic ratio was used to project 1988 operating expense it had been accurate to within one percent. Blue Cross chose not to use the ratio from 1989 because it "was determined not to be a good predictor of what future operating expenses will be because of cost savings measures (unspecified) that are being implemented for the rating period." The witness pointed out that the projected increase in operating expense made up only 1.43 of the total 20.76 percent increase requested for Class DIR Pool I rates. He claimed that certain regular audits of Blue Cross cost accounting and cost allocation ensured that "this cost allocation system is fairly and accurately applied."
On cross-examination the witness conceded that the use of a simple ratio carried forward from 1988 to 1989 was not an accurate forecasting method, since operating expenses turned out to be higher than predicted. 1990 Transcript, pp. 43-44. The witness, nevertheless, insisted that an increase based on the 1988 ratio rather than the 1989 would be more accurate because of cost-reducing activities in 1990 such as personal reductions, automation and vented space elimination. Id., pp. 81-86. He reiterated that the loss of the CHAMPUS contract distorted the 1989 operating expenses. Also, he asserted that the audits referred to in his direct testimony were acceptable indicators of the reasonableness of the operating cost expense allocation. According to him these audits validated the allocation of such costs to other specific programs. Id., pp. 79-80. Even though none of these audits focus particularly on the allocation to Class DIR they validate the methodology by which allocations are in fact made to that Class. Id., p. 80.
In his 1990 testimony for Blue Cross, Mr. Michael J. Recorvits touched only briefly on the question of operating cost expenses. He simply reaffirmed Mr. Battista's testimony that a ratio based on 1988 experience was more valid than one based on 1989. See 1990 Blue Cross Exhibit 1, p. 27. On cross-examination he freely acknowledged that the method used to predict 1989 expenses was not accurate and under-predicted actual experience. 1990 Transcript, p. 153. He testified: "I don't think personally I would be opposed to taking a look at actual operating expenses in '89 per contract and applying an inflationary trend (factor?) to that per contract month (?) basis." Id., p. 154.
Once again, in the 1990 hearings, Mr. Ronald Becker testified for the Attorney General. He leveled a barrage of criticism at the Blue Cross filing. On the issue of operating cost expense he made four main points. 1990 Transcript, pp. 185-90. The method used by Blue Cross was flawed because (1) it provided no incentive to control costs since it ensured reimbursement on a historic basis, (2) it inflated operating costs at the same rate as incurred claims expense, thereby linking the rate of administrative cost increases to health care increases, despite, common knowledge that inflation of health costs has far out-stripped inflation in the general economy, (3) it had no justification for the reasonableness and propriety of the expenses actually incurred during the base year and (4) the allocation of total corporate costs among Class DIR and the other classes and lines of business administered by Blue Cross was not equitable, since those other classes and lines had more pricing clout than Class DIR. He suggested that "the operating allowance per contract contained in the current filing be increased by a factor of six to eight percent and used for the rating year."Id., p. 190. Although the witness intimated that such an increase was related to an increase in a consumer price index he did not define that relationship. This suggestion implies that the operating allowance contained in 1989 rate, even if derived from a fundamentally flawed methodology, and its allocation even if inequitable, is an acceptable, albeit imperfect, basis for an increase in 1990 rates. The Court assumes, but like the Director's expert, can't tell whether the application of this suggestion would yield a lower rate than that requested by Blue Cross. See 1990 Transcript, pp. 235-36.
The Director was fully justified in discerning that all experts agreed that Blue Cross operating expenses would show an increase in each rate year. He was given three choices, in essence: first, he could make no allowance for any increase in this cost thereby plunging this class deeper into a forbidden reserve deficit posture; second, he could apply the more or less arbitrary factor suggested by the Attorney General's expert witness, relying to some degree on assumptions called "flawed" by that witness, or (3) he could, with misgivings, accept the Blue Cross proposal and suggest, as he did in 1990, that he wants better expert fiscal evidence regarding the factors which justify expenses actually incurred during any base year, the equity of internal allocations of overall corporate operating costs and the factors which legitimately project inflationary or recessionary functions affecting these costs.
The decision as to how much revenue Blue Cross needs to pay its subscribers' legitimate claims and to continue to operate belongs to the Director, so long as he makes that decision rationally with the support of substantial competent evidence. This Court will not say that the Director made the wrong choice here in 1990, given the conflict in the expert testimony and in recognition of the Director's implied warning to Blue Cross.
II.
AFFORDABILITY
The Attorney General contends that this court should set aside the Director's decisions in both the 1989 and 1990 rate cases for Class DIR because the Director failed to consider the affordability of the rates to eligible subscribers. The question of affordability as a component of the public interest requirement of § 27-19-6 derives from the decision of our Supreme Court in Hospital Service Corporation of Rhode Island v. West,112 R.I. 164, 308 A.2d 489 (1973). In that case the Court ruled that permitting the Director to overturn reasonable management decisions of the board of a nonprofit hospital service corporation without subjecting commercial insurers to the same restrictions did not violate the Equal Protect Clause of the Fourteenth Amendment. The Court said:
 "All of us are aware of the public need for adequate medical benefits which are supplied at a cost the average wage earner can afford. California Physicians Service v. Garrison, 28 Cal.2d 790, 172 P.2d 4 (1946). The two-pronged test found in § 27-19-6 is designed to guarantee that that public need will continue to be served." Id., 112 R.I., at 179.
Nearly two decades later we must all be aware that no Blue Cross rate regulation in this State alone will guarantee adequate medical benefits at a cost the average wage earner can afford. The problem of escalating health care costs and the concomitant cost of health care insurance are so far beyond the control of the Director that he can respond to the public interest as described in West, supra, only by shifting the burden of meeting those increases from one special interest group to another. That decision, if it is made at all, is a highly-charged policy decision and should be properly made only by the political branches.
There were members of the public who testified at both hearings who complained that Blue Cross coverage was very expensive. No witness testified that he or she was compelled economically to terminate Blue Cross coverage on a Class DIR subscription and was thereafter denied necessary health care. No economic evidence was presented to show the nature and economic resources of the "market" in which Blue Cross Class DIR coverage offers its service. The theoretical market includes every adult resident not eligible for group membership, or medical assistance pursuant to G.L. 1956 (1990 Reenactment) § 40-8-3 (Medicaid), or Title XVIII, U.S. Social Security Act, 42 U.S.C. §§ 1395 et seq. (Medicare), or, conceivably, § 42-62-5 (CHIP). There are probably other defining limitations to the eligible population. As of the 1989 rate filing approximately 18,300 eligible "buyers" in the market found Class DIR "affordable", because they had bought it. See 1989 Blue Cross Exhibit 2. As of the 1990 rate filing the number of "buyers" had decreased to roughly 13,500. No one knows how many of the 4,800 "lost" purchasers did not repurchase because the "price" was too high, or their "demand" too low, as opposed to their leaving the health care insurance "market" for other reasons.
In the absence of valid market studies the Director has no way of evaluating expert economic opinions as to the marginal impact of rate changes. Put another way, the Director has no way of knowing how many, if any, of the purported "lost" buyers would have bought if the price had increased by less than it did, or how many, if any, additional buyers would have bought coverage if the price had been unchanged or decreased by any particular amount. The Director is provided with no theoretical construct or market model on which to assess the impact of rate changes on the relevant market. The experience of Pool II is conceded to be inconclusive.
Even if the Attorney General is correct in his ultimate conclusion that, as the non-public insurer of last resort, Blue Cross rates have reached the point that so many buyers are excluded from the market that adverse selection will eventually eliminate the pool, or market entirely, he makes no suggestion as to what the Director is to do about it with respect to Class DIR rates alone. Mr. Becker suggested that one approach to the affordability problem would be to increase rates slightly for the experience-rated groups in Classes IER and PER, from which a substantial majority of subscribers in Class DIR converted, to provide a substantial rate relief to Class DIR subscribers. See1990 Transcript, pp. 193-97. When the Court suggested at a hearing on an ancillary aspect of this appeal that the Director might consider rate increases for Classes IER, PER and DIR together, the response of counsel for all parties, including especially the Attorney General, was a shocked gasp. But, how is the Director to regulate Class IER and PER rates at a DIR hearing? Does not the "retention" suggested by Mr. Becker resemble the "subsidy" so dreaded by the Attorney General? What would be the position of counsel for public employers and public employee groups, who appeared at the 1989 hearing, on the prospect of increased rates for these groups to provide rate relief for another class of subscribers?
All of the activity of Blue Cross to enhance the affordability of its product really is an attempt to offer less product, in the sense that it is offering less risk assumption or insurance at a lower price. The alternate products offered by Blue Cross, such as the Economy Options, either cover less than all of the risk to insureds by including or increasing deductibles and co-payment provisions or by limiting the dollar amount of benefits, or by covering less of the exposure of the total class through pooling the lower health risks at a lower rate in the so-called Class DIR Pool II, whose rates are based on Class PER experience and not on Class DIR experience. These marketing devices are an obvious effort by Blue Cross to increase the availability of some level of insurance but cannot meet the question of affordability, as raised by the Attorney General. That question is beyond the scope of any adequate response by the Director.
In each Decision the Director found that granting the proposed rate increases for Class DIR Pool I, modified to reflect a two percent reserve contribution rather than the four percent requested, was not only consistent with the proper conduct of Blue Cross' business but was also in the interest of the public.1989 Decision, V. Conclusions of Law, No. 8 (Adopted as a Finding of Fact); 1990 Decision, V. Conclusions of Law,No. 8 (Adopted as a Finding of Fact). It is true that the Director did not indulge in any discussion of the factors which led him to conclude that the public interest was best served by these rate increases, but the record is replete with substantial evidence that, if the members of the public in Class DIR are to continue to be served as a separate class of subscribers, the rate increases approved were inevitable. Blue Cross plainly showed that it had made a good faith effort to mitigate the impact of increased health care costs by offering other packages and programs and subdividing the Class. The Attorney General is not justified in accusing the Director of ignoring the problem of affordability. He didn't ignore it; he reasonably surrendered to its intractability as a ratemaking component.
In both cases the appeals are denied and dismissed. The decisions of the Director are affirmed.
The defendant will present a form of judgment for entry on notice to all other parties.