BLUE CROSS AND BLUE SHIELD OF
RHODE ISLAND

v.

Thomas J. CALDARONE, Jr., Director of
the Department of Business Regulation
of the State of Rhode Island et al.

Nos. 85–53–M.P, 85–61–M.P.

Supreme Court of Rhode Island.

Feb. 10, 1987.

James Purcell, Tillinghast Collins & Graham, Elia Germani, Providence, for plaintiff.

James Hardy, R.I. Legal Services, John F. Smollins, Jr., Susan D. Hayes, Dept. of Business Regulation, Arlene Violet, Atty. Gen., Providence, for defendants.

## OPINION

SHEA, Justice.

On March 15, 1985, this court issued a writ of certiorari for the purpose of reviewing a decision of the Superior Court that had reversed the decision of the director of the State Department of Business Regulation (director). The director had denied certain components of a 1981 health-insurance-rate request filed by Blue Cross and Blue Shield of Rhode Island. As discussed below this rate request had been the subject of two administrative hearings and two Superior Court decisions.[1] We affirm.

1. The Rhode Island Department of Elderly Affairs, Coalition for Consumer Justice, the Silver Lake Senior Citizens' Club and the Harvey Clements Senior Citizens' Center intervened in these proceedings and joined the Attorney General of Rhode Island in opposing the rate request. On appeal the Department of Elderly Affairs and the Coalition for Consumer Justice

Blue Cross of Rhode Island and Blue Shield of Rhode Island (Blue Cross) are a nonprofit, charitable, hospital-service corporation and a medical-service corporation, respectively, incorporated under G.L.1956 (1979 Reenactment) chapter 19 of title 27.[2] Together they underwrite several health-care plans which provided health-care benefits to approximately 85 percent of the State of Rhode Island during the period when this controversy arose.

Plan 65, the particular health-care plan at issue in this case, was jointly underwritten by the corporations. It was designed to provide coverage to persons who were age sixty-five or older so that they would not have to pay the ever-increasing deductibles and copayment amounts not covered under Medicare.

In June of 1981 Blue Cross sought an increase in the rate of premium for Plan 65. The increase had several components. However, the only components at issue in this case were those amounts intended for reserve-deficit recovery and contribution to reserve.

The provisions of G.L.1956 (1979 Reenactment) §§ 27–19–6 and 27–20–6 govern rates that may be charged by Blue Cross. They provide in relevant part:

"The rates proposed to be charged by any corporation organized under this chapter to its subscribers shall be filed by such corporation at the office of the director of business regulation. At any hearing held hereunder, the applicant shall be required to establish that the rates proposed to be charged to subscribers are consistent with the proper conduct of its business and with the interest of the public. Any corporation organized under this chapter shall maintain total reserves in a dollar amount sufficient to pay claims and operating expenses for not less than one half (½) month nor

more than one and one half (1½ months)."

The director, after a hearing, rendered a decision in which he approved the rate request in part but disallowed those components that were proposed to recover Plan 65's projected deficit as of October 31, 1981, and to establish a reserve in the amount of $1,037,739 for the period ending October 31, 1982. Blue Cross appealed from the director's decision to the Superior Court pursuant to G.L.1956 (1977 Reenactment) § 42–35–15, also known as the Administrative Procedures Act. The Superior Court affirmed the director's decision except for the director's disapproval of increase intended to recover Plan 65's projected deficit and establish the proposed reserve. On that point the trial justice remanded the case to the director "for the limited purpose of making a determination in accordance with this opinion as to whether the applicants have established that the requested increases are consistent with the interest of the public."

At the remand hearing evidence was presented by Blue Cross that the total corporate reserves had fallen to approximately three days or one-tenth of a month. Plan 65's deficit operation alone had reduced the total corporate reserves by more than $7 million as of February 28, 1983. Total corporate reserves as of September 30, 1981, had been $20,040,000 but by December 31, 1981 had dropped to $16,556,000 and by March 31, 1982, had dropped to $10,206,000. As of June 30, 1985, the total corporate reserve had been reduced to $2,877,000. It was during this period that Plan 65's reserve deficit grew from $1,894,-752 to in excess of $7 million, a very significant component of the total financial condition of the corporation.

A witness for Blue Cross testified without contradiction at the remand hearing that the purpose of reserve requirements

submitted briefs in which the other appellants concurred.

**2.** As of July 31, 1981 Blue Cross and Blue Shield were separate corporations, but in October 1982 they combined into a single corporation with a single total corporate reserve.

such as those set forth in §§ 27–19–6 and 27–20–6 was to guard against actuarial miscalculations or fluctuations in expense for reasons that were not anticipated.

Evidence was also presented to establish that Blue Cross rates to its subscribers had increased over the previous four years approximately 77 percent. According to one employer, whose company was a subscriber to the experience-rate group-hospital-medical-coverage plan, Blue Cross had been a cost effective supplier of health-care services in the past. However, because of the rate increases by Blue Cross, the subscriber company was exploring self-administered plans as a possible alternative if Blue Cross ceased to be competitive and cost effective. The gap between Blue Cross and other plans was narrowing and approaching the break-even point.

Evidence of the resolution adopted by the board of directors of Blue Cross requiring that the rate filing in question provide for the Plan 65 deficit recovery and contribution to reserve was also presented. The executive vice president of Blue Cross testified that it was Blue Cross's position that any subsidy of Plan 65 would require non-Plan–65 subscribers to pay additional funds to offset Plan 65's deficit, that Medicare already subsidizes those Plan 65 subscribers very substantially, that Blue Cross had never found any empirical evidence to show that an additional subsidy was required, and that there was no evidence presented that proved that Plan 65 subscribers could not pay the proposed increases. Sound accounting, insurance and actuarial principles, and the statutory guidelines for Blue Cross do not permit discriminatory treatment of any class of subscribers. Furthermore, the testimony continued, to require Blue Cross to do so would place it at a disadvantage in its other plans because it would require the raising of subscriber rates for those plans, making them noncompetitive with commercial insurers and thereby lessening any financial benefit to non-Plan–65 subscribers. Also it was the thinking of Blue Cross that if putting Plan 65 on a sounder financial basis was not permitted, consideration would have to be given to withdrawing the plan altogether.

Evidence was also presented that the social security benefits to Plan 65 subscribers had been increased by cost-of-living adjustments from 1979 thru 1981, the increases amounting to almost 13 percent per year, whereas the manufacturing-wage increases for the same period in Rhode Island had only increased from 9.5 percent to 9.6 percent. The petitioners presented no contrary evidence.

In his decision the director determined that Blue Cross had failed to meet its burden of proving that the recovery of the reserve deficit and a contribution to the reserve were in the public interest. The director stated that he had broad discretion to treat total corporate reserves unilaterally and not segregated by classes of subscribers. His conclusion was that the "deferment" of Plan 65's contribution to reserve and the projected deficit recovery in 1981 were in the public interest.

On the second appeal to the Superior Court by Blue Cross, the trial justice rendered a decision reversing the director. He ruled that there was an abundance of evidence in the record presented by Blue Cross tending to show that the recovery of the reserve deficit and contributions to reserve for Plan 65 were in the public interest and no evidence existed to the contrary. The trial justice stated in part:

"The testimony presented by [the Blue Cross executive vice president] was not contradicted by any other testimony nor was the credibility of the witness in any way impeached. In effect the testimony * * * was ignored by the director. His finding of fact 'that the reduction in reserves between 1981 and 1983 is *not* attributed to the failure of Plan 65 subscribers to contribute to the applicant's reserve structure and to recover the Plan's operating deficit' is contrary to what testimony was in fact presented at the remand hearing. A review of the record of these proceedings would lead

me to the conclusion that the Director limited himself to a concern for the interest of those Plan 65 subscribers."

The trial justice correctly stated that his review in this situation was limited to determining whether the findings of the director are supported by legally competent evidence. *Guarino v. Department of Social Welfare*, 122 R.I. 583, 588–89, 410 A.2d 425, 428 (1980); *Narragansett Wire Co. v. Norberg*, 118 R.I. 596, 607, 376 A.2d 1, 6 (1977); § 42–35–15(g). The issue before him was whether the director, in his decision of February 10, 1983, acted unlawfully, arbitrarily, or clearly erroneously in finding that Blue Cross had failed to sustain its burden to prove that the projected rate increase necessary to recover the Plan 65 projected deficit as of October 31, 1981, and to establish a reserve for the same period was consistent with the interest of the public. After examining the record, he concluded that the director had clearly acted erroneously and, therefore, he reversed his decision.

The writ of certiorari brings before us the record of the lower court that we review on issues of law only. *Providence Journal Co. v. Mason*, 116 R.I. 614, 620, 359 A.2d 682, 685 (1976). We do not weigh evidence but merely examine the record to determine what legal evidence and reasonable inferences to be drawn from it support the conclusion of the lower court or agency. *Berberian v. Department of Employment Security*, 414 A.2d 480, 482 (R.I. 1980).

█ In our opinion, the most obvious element of this case is embodied in § 27–19–6, which provides explicitly that minimum corporate reserves must be maintained in a dollar amount sufficient to pay claims and operating expenses for not less than one-half month. This requirement is not discretionary. It is mandatory because the General Assembly has conclusively determined that such a reserve is in the public interest.

There can be no question that § 27–19–6 requires Blue Cross to maintain total corporate reserves in a dollar amount sufficient to pay total corporate claims and operation expenses for not less than one-half month. It is unlawful for Blue Cross to have reserves in a lesser amount than those required. The evidence that the total corporate reserves and the reserve for Plan 65 were well below the statutory minimum is uncontradicted. Consequently, the director's decision would require Blue Cross to operate well below the statutory minimum in regard to Plan 65 because in his decision he refused to allow the proposed contribution to reserve to build up future reserves in Plan 65 to the minimum required by law. Neither did he permit a recovery of the existing deficit in reserve. The decision of the director would require Blue Cross to operate in violation of the law. Therefore, the director is in error as a matter of law, and the trial justice was correct on that issue.

We note that the director in his decision stated that he had broad discretion to treat total corporate reserves unilaterally and not segregated by classes of subscribers. Although we agree that the directives in §§ 27–19–6 and 27–20–6 concerning minimum corporate reserves refer to total corporate reserves, the underlying principle applies with equal force to individual lines or classes of business. The consistent position of the Department of Business Regulation was that Plan 65 maintain its own reserves in compliance with the statute. As the director stated in a decision rendered in 1980:

"The Director continues to adhere to the requirement of the establishment of a one-half month reserve for Plan 65 which has been the consistent position of this Department in recent years. It is our intention not to abandon that standard, nor do we intend at this time to maintain the reserve of Plan 65 by allocating to Plan 65 reserves attributable to other classes of subscribers."

Also in a 1979 decision the director responded to a proposal that he allow Plan 65

to pay less than its costs for health care by saying:

"Approval of such a scheme by this Department would amount to substantially providing a tax on those employers who provide employee health benefits through the applicants for the benefit of Plan 65 subscribers. We believe that such taxation is appropriately left to the General Assembly."

It seems therefore unreasonable for the director, without any probative evidence before him to suggest the change, to depart from the prior decisions on this point that still appear to be based on sound business practice, sound accounting and actuarial principles that, on the record before us, appear to be in the public interest.

Lastly we would say that in our opinion there is no merit to the argument that approval of the reserve-deficit recovery and contribution to reserve would amount to retroactive rate making. There was nothing retroactive in the rate request at the time it was filed. Only the action of the director and the protracted appeal and rehearing process give the request a retroactive aspect.

 Furthermore it is doubtful that the rule against retroactive rate making has any application in this kind of situation, absent a finding that a deficit results from mismanagement. Blue Cross is composed of nonprofit hospital and medical service corporations organized under chapters 19 and 20 of title 27. Unlike public utilities they are not granted exclusive monopolies in specific geographical areas. Rather they must face substantial competition with numerous private companies who offer similar coverage to their subscribers and policy holders. Public utilities, on the other hand, prohibited from retroactive rate making, are profit-oriented monopolies entitled by law to earn a fair profit or rate of return for their investors.

For the foregoing reasons, we conclude that the Superior Court action reversing the director must be affirmed. Therefore, the petition for certiorari is denied, our

order staying the Superior Court reversal is vacated, the writ heretofore issued is quashed, and the papers of this case are remanded to the Superior Court with our decision endorsed thereon.

WEISBERGER and MURRAY, JJ., did not participate.