[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is an appeal from the decision of the Rhode Island Commission for Human Rights made and entered on June 12, 1991 pursuant to G.L. 1956 (1988 Reenactment) § 42-35-15.
CASE TRAVEL
On February 3, 1981 Naurita L. Waters filed a complaint against the State of Rhode Island Department of Mental Health, Retardation and Hospitals (hereinafter MHRH) with the Rhode Island Commission for Human Rights (hereinafter the Commission). Ms. Waters alleged that the MHRH discriminated against her with respect to terms and conditions of employment based upon her race (African-American) and color (black) in violation of G.L. §28-5-7.
On July 26, 1989, September 15, 1989, and October 2, 1989 hearings on the complaint were held before Commissioner Cleon E. Harvey. On June 12, 1991, the Commission entered its decision and order, concluding that "the [MHRH] discriminated against [Ms. Waters] with respect to compensation because of her race and color." (Decision and Order, at 5.)
In its decision and order, the Commission made the following findings of fact. Ms. Waters is a black woman who has worked for the MHRH at the Institute of Mental Health (IMH) since 1959. She obtained her Master's Degree in Nursing. In August 1985 she was named Acting Director of Nursing Services. In August 1986 she was named permanent Director of Nursing Services. She was paid at a grade 233. The MHRH is responsible for two other hospitals, the General Hospital and Zambarano Memorial Hospital (hereinafter Zambarano), and a school, Ladd Center.[1] The Directors of Nursing Services at Zambarno and the General Hospital are paid at grade 237. As of June 12, 1991 those Directors were white.
In April 1984 the MHRH requested that the Director of Nursing Services at the General Hospital be upgraded from pay grade 233 to pay grade 237. In the MHRH memorandum to the budget office it stated that the request was made as a result of the General Hospital's inability to attract qualified personnel for the position. (Exhibit #12, #13). The position was upgraded to pay grade 237.
Anita Fine (a white woman) was the Director of Nursing Services at the IMH from 1980 to 1985. When the pay grade for the Director of Nursing Services at the General Hospital was increased, Ms. Fine requested that her pay grade also be increased to pay grade 237. Initially her request was refused. On November 14, 1984 the MHRH sent a memorandum to the Budget Office requesting that the Directors of Nursing Services at the IMH, Zambarano, and the Ladd Center be paid the same pay grade as the Director of Nursing Services at the General Hospital: grade 237. The memorandum states that the MHRH wants all Nursing Directors to be at the same pay grade because all require the same education and training, experience, judgment and initiative, difficulty of work, personal relationships, patient care and working conditions. (Waters' Exhibit 7). In July 1985 the Budget Office informed the MHRH that the request for upgrades was denied. In April 1986 the MHRH requested an upgrade to pay grade 237 for the Director of Nursing Services at Zambarano. The incumbent in the position was white. The upgrade for Zambarano was approved in June 1986. Ms. Waters became Acting Director of Nursing Services at the IMH in August 1985 and permanent Director in August 1986. While she held the position, Ms. Waters made no attempt to seek an upgrade in her pay grade.
The MHRH explained its decision not to seek an upgrade in pay grade for Ms. Waters in various ways. The MHRH answer states as a defense that the [two] "institutions that have the grade [2]37 positions are larger than the IMH and further, that the IMH's patient census will be reduced more in the near future." The testimony of MHRH director, Thomas Romeo, as to the differences in pay grades, also referred to the difference in sizes of the hospitals (Trans. 9/25/89 a.m. p. 29). He also discussed the difference in the care of physically ill patients at the General Hospital and Zambarano and the care of mentally ill patients at the IMH, the increased responsibility with the new Alzheimer's Unit at Zambarano, the increased relationship of departments between Zambarano and the General Hospital and the position of Donna Marsh, Executive Director for Mental Health Services, that she could not support an upgrade of Ms. Waters' position. (Trans. 9/25/89, a.m. 11-12, 29, 33, 35, 36 and 48). Mr. Romeo testified that he "did not get into detail" with Ms. Marsh on her recommendation (Trans. 9/25/89 a.m. p. 36). Ms. Marsh did not testify.
David Askew, Administrative Officer at the IMH, testified that he and Ms. Marsh agreed that it was not appropriate within the salary structure of the IMH to upgrade Ms. Waters (Trans. 9/25/89 a.m. p. 91). Mr. Askew testified that his opinion was that giving Ms. Waters an upgrade would put her grade level and salary level out of synch with the rest of the IMH department heads and that the upgrade would be poor for morale. (Trans. 9/25/89) p.m.p. 69-70). In September, 1987 Ms. Waters wrote Mr. Askew requesting that he take action to upgrade her pay grade (Waters' Exhibit 5). In October, 1987, Mr. Askew replied that there was a study being conducted relative to the pay structures at the Division of Mental Health, that all upgrading would be done within the context of this study and that he would inform her of the progress of the study (Waters' Exhibit G). Mr. Askew testified that the study was done but that it was not a written study and that Ms. Waters' charge of discrimination was filed by the time the study was complete so that he did not feel it was appropriate to discuss it with Ms. Water (Trans. 9/25/89, a.m. p. 85). The patient census at the IMH has declined to some extent. In 1986 it was approximately 260. In 1989 it was 180 to 199. In 1989 the General Hospital patient census was approximately twice the patient census at IMH. In 1989 Zambarano's patient census was approximately 250.
In 1986 Ms. Waters supervised approximately 341 positions. In 1989 she supervised approximately 261 positions. In 1989 the Director of Nursing Services at the General Hospital supervised approximately 540 positions. In 1989 the Director at Zambarano Hospital supervised approximately 169 positions.
Mr. Romeo testified that he did not know if the new Alzheimer's Unit at Zambarano was added between the November 14, 1984 denial to upgrade all the Directors of Nursing Services and the April 1986 request to upgrade the Director of Nursing Services at Zambarano.
Additionally, the Commission found that the job specifications for Ms. Waters as Director of Psychiatric Nursing Services are virtually identical to the job specifications for the Director of Nursing Services at the General Hospital and Zambarano except for references to psychiatric rather than general nursing services (Waters' Exhibited 3 and 4). The stated education and experience requirements are essentially identical. (Decision and Order, at 2-5).
The Commission concluded that the size of the institutions and the scope of responsibilities did not significantly change in nine months and also that the job specifications of Ms. Waters' job were virtually identical to the job specifications of white women who are paid more than Ms. Waters. Thus the Commission found that the MHRH's stated reasons for refusing to upgrade were merely a pretext for unlawful discriminatory motives. (Decision and Order, at 6.) The MHRH has appealed the Commission's decision to this Court.
The review of a decision by the Commission is controlled by G.L. 1956 (1988 Reenactment) § 42-35-15 which provides for the judicial review of contested agency decisions:
 42-35-15. Judicial review of contested cases.
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency regarding the credibility of the witnesses or weight of the evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 453 A.2d 1307, 1209 (R.I. 1988). Furthermore, this Court must limit its review of the record to determine whether any legally competent evidence exists to support the agency's decision. Blue Cross Blue Shield v.Caldarone, 520 A.2d 969, 972 (R.I. 1987). Thus, this Court will reverse factual conclusions of administrative agencies only when those conclusions are "totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Mgmt.Council, 434 A.2d 266, 272 (R.I. 1981). However, this Court "may freely review questions of law to determine what the law is and its applicability to the facts." Chenot v. Bordeleau,561 A.2d 891, 893 (R.I. 1989); Carmody v. Rhode Island Conflict ofInterest Commission, 509 A.2d 453, 458 (R.I. 1986).
G.L. 1956 (1988 Reenactment) § 28-5-7(1)(A)(B) states that "[i]t shall be an unlawful employment practice . . . [f]or an employer . . . because of [an applicants] race or color, religion, sex, handicap, age, or country of ancestral origin . . . to . . . discriminate against him with respect to hire, tenure, compensation, terms, conditions or privileges of employment." The court in Newport Shipyard stated "the trial justice, in considering claims brought pursuant to our Chapter 5 of Title 28, should look for guidance in this sensitive area to decision of the federal courts in constructing the Civil Rights Act of 1964.Newport Shipyard v. Rhode Island Commission for Human Rights,484 A.2d 893 (R.I. 1984). In a complaint under this section, the Commission must apply the standard set forth in McDonnellDouglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Texas Department of Community Affairs v.Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
The Federal Title VII cases which we follow in interpreting our state statute have established the basic allocation of burdens and order of presentation of proof:
 First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.[2]
 Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.
 Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination. Texas Dept. of Community Affairs v. Burdine, supra at 252-53. (citing McDonnell Douglas Corp. v. Green, supra, 802-04 (1973)).
The above analysis is precisely the one that the Commission applied to Ms. Waters' complaint. However, subsequent to the Commission's decision, the United States Supreme Court clarified the McDonnell Douglas framework. In St. Mary's Honor Center,et al. v. Melvin Hicks, No. 92-602, 1993 WL 220265 (U.S. June 25, 1993), the United States Supreme Court held that despite the fact finder's determining that the employer's proffered reason constitutes a pretext for discrimination, additional proof of discrimination is required. Such additional proof is required as the ultimate burden of persuading the trier of fact that the defendant employer intentionally discriminated against the plaintiff and remains at all times with the plaintiff. Id. at 3 (quoting Texas Dept, of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). The Supreme Court continued to define "pretext" as "pretext for discrimination" with respect to ". . . form rather than the substance of the defendant's production burden . . . ." St. Mary's Honor Center v. Hicks, 1993 WL 220265 at 8, ultimately holding that the McDonnell Douglas presumption is a procedural device, designed only to establish an order of proof and production." Id. 3. Accordingly, whether the plaintiff's proffered reason of race is correct remains the question for the factfinder to answer, Id. at 4, while whether the Commission's findings are supported by substantial evidence of record is subject to review by this Court.
The language of G.L § 42-35-15 indicates that judgments as to questions of fact are left to the sound discretion of the Commission. Only if the Commission's factual determinations and concurrent credibility judgments are unsupported by "substantial evidence" within the record may this Court refuse to accept them. "Substantial evidence" is that which a reasonable mind might accept to support a conclusion, i.e., more than a scintilla of competent evidence. Newport Shipyard, supra at 897. After the review of the record and determining that there is substantial evidence to support the Commission's factual findings, this Court affirms the Commission's decision.
The Commission concluded that the Ms. Waters met her prima facie burden. (Decision and Order, at 6.) First, it is uncontested that Ms. Waters is a member of a racial minority and secondly that Ms. Waters is paid less than her "white" counterparts for work of virtually identical responsibilities.
The Commission then turned to the MHRH's attempt to rebut this prima facie evidence and determined that the MHRH succeeded in articulating legitimate, non-discriminatory reasons for its actions. Those reasons, stated simply, are that the differences in the size of the institutions, the different scope of responsibility, the recommendation of Ms. Marsh, and the need to maintain staff morale at the IMH by keeping salaries synchronous motivated the MHRH not to seek an upgrade for Ms. Waters' position. (Decision and Order, at 6.)
The Commission determined that the above reasons were actually a mere pretext for discriminatory compensation practices. (Decision and Order at 6-8.) The Commission found the purported reason for refusal to upgrade not credible, particularly since the MHRH requested an increase in the pay grade when a white woman was the incumbent.[3] There is ample evidence to support this conclusion. The Commission found that while the patient population at IMH had decreased, it was still comparable to that of the Zambarano patient population. This is based on Mr. Romeo's testimony that there were "180, 190 people, in that figures" (Trans. 9/25/89 a.m., p. 38-39); and Waters' Exhibit 2 which notes a patient census of 199 in March 1989. Ms. Waters testified that she supervised 261 people in 1989 (Trans. 7/26/89 p. 44).
The Commission relied on both a memorandum written by the MHRH which indicated that the positions of Director of Nursing Services at the three hospitals required the same education, training, experience, patient care and working conditions. (Waters' Exhibit 7), and job descriptions of the Director of Nursing Services at the three hospitals. (Waters' Exhibits 3 and 4.)
The Commission had no direct evidence before it as to Ms. Marsh's recommendation. Mr. Romeo testified that he relied on the recommendations of Ms. Marsh but that he did not "get into detail" with her (Trans. 9/25/89, at p. 36). Ms. March did not testify. The Board further found that it is likely that Ms. March's recommendation to Mr. Romeo concerned the September 1987 upgrade request made by Ms. Waters rather than the earlier April 1986 decision not to request an upgrade for the IMH. This is likely because on September 25, 1989 when Mr. Romeo testified, he stated that Ms. March had been working for the MHRH for approximately three years (Trans. 9/25/89 a.m. p. 59).
The Commission had no testimony from Mr. Romeo as to the upgrade, the staff morale, or a need to keep Ms. Waters' salary in "synch" with other IMH administrators as a justification for his decision.
Thus the foregoing evidence supports the Commission's decision that the MHRH had discriminated against Ms. Waters because of her race. (Decision and Order at 6-8.) The Commission based its decision on the above evidence and that evidence demonstrates that the MHRH treated Ms. Waters differently from a similarly situated white employee. Thus the Commission concluded that Ms. Waters was paid less than her white counterparts for work which requires substantially the same responsibility. The record reflects that the Commission was neither clearly erroneous nor arbitrary and capricious in its application of the facts of this case to the correct standard of law as the plaintiff did successfully carry her burden of persuasion.
Finally, the MHRH questions the propriety of the Commission's remedies. It contends that the order was made in excess of its lawful authority. The MHRH asserts that it does not have the authority to update the position and thus cannot comply with the Commission's order. The MHRH can submit a request for an upgrade. That request is forwarded to the Department of Administration. The Director of the Department of Administration, if it agrees, then forwards the recommendations to the governor. The governor then approves or disapproves it. See generally R.I.G.L. §36-4-15.
The Commission ordered the MHRH to cease and desist from further unlawful discrimination. Further it ordered the MHRH to take all steps necessary to increase the pay grade and to remunerate Ms. Waters with back pay, benefits, interest and attorney fees. (Decision and Order at 8-9.) The authority for the Commission's order is found in G.L. 1956 (1981 Reenactment) §28-5-24, which states that
 upon finding unlawful discrimination the commission shall issue and cause to be served on the respondent an order requiring the respondent to cease and desist from such unlawful employment practices, and to take such further affirmative or other action as will effectuate the purposes of this chapter, including, but not limited to hiring, reinstatement, or upgrading of employees with or without back pay, or admission or restoration to union membership, including a requirement for reports of the manner of compliance. Back pay shall include the economic value of all benefits and raises to which an employee would have been entitled had an unfair employment practice not been committed, plus interest on such amounts. . . .
The Commission has the power to impose such orders pursuant to G.L. § 28-5-6 which defines "the term employer [to] includes the state and all political subdivisions thereof . . ." The above statutes are in accordance with the public policy adopted in G.L. § 28-5-3 which declares "the public policy of this state to foster the employment of all individuals in this state in accordance with their fullest capacities regardless of their race or color, religion, sex, handicap, age or country of ancestral origin and to safeguard their right to obtain and hold employment without such discrimination."
For the foregoing reasons, this Court affirms the decision of the Commission for Human Rights in all respects.
[1] The Commission found that the Ladd Center was not similarly situated to the hospitals, General Hospital, Zambarano and IMH. Ladd Center is a school; the others are hospitals. Ladd Center did not have many nurses.
[2] The elements of a "prima facie case" of compensation discrimination that a plaintiff must prove are
1. that he is a member of a protected class; and
2. that he is paid less than a member of a different race for work which requires substantially the same responsibilities.
Lowery v. WMC-TV, 658 F. Supp. 1240, 1263 (W.D. Tenn. 1987);Uviedo v. Steves Sach and Door Co., 738 F.2d 1425 (5th Cir. 1984); Pittman v. Hattiesburg Municipal separate SchoolDistrict, 644 F.2d 1071 (5th Cir. 1981).
[3] The Commission found that the request to upgrade the position of Director of Nursing Services at the IMH was made and rejected before Ms. Waters was appointed Acting Director. Further, Mr. Romeo testified that Anita Fine was the incumbent when requests for upgrades were submitted. (Trans. 9/25/89 a.m., p. 76). Therefore, the Commission's finding that no request for an upgrade of the salary of the Director of Nursing Services at IMH was made while Ms. Waters held the position is supported by the evidence.