[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Blue Cross and Blue Shield of Rhode Island ("Blue Cross" or "the appellant") has appealed a decision of the Director of the Rhode Island Department of Business Regulation ("the Director"), rejecting proposed rate increases for a particular class of health insurance subscribers. The Director has objected, urging the Court to uphold its decision. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS AND TRAVEL
Blue Cross and Blue Shield of Rhode Island is a nonprofit, charitable, hospital and medical service corporation incorporated pursuant to chapters 19 and 20 of title 27 of the Rhode Island General Laws. BlueCross and Blue Shield of Rhode Island v. Caldarone, 520 A.2d 969, 970
(R.I. 1987). The rates charged by Blue Cross are regulated by the State pursuant to §§ 27-19-6 and 27-20-6, identical provisions which vest the Director with authority to review proposed rates. Before ruling on a rate proposal, the Director must hold a public hearing, at which Blue Cross is charged with "establish[ing] that the rates proposed to be charged to subscribers are consistent with the proper conduct of its business and with the interest of the public." Sections 27-19-6 and 27-20-6. Rates proposed must be "sufficient to maintain total reserves in a dollar amount sufficient to pay claims and operating expenses for not less than one month." Id. Following the hearing, the Director may approve, disapprove, or modify the filing. Id.
Following recent public controversy regarding the management of Blue Cross, the Rhode Island General Assembly enacted The Rhode Island Health Care Reform Act of 2004 — Health Insurance Oversight, §§ 42-14.5-1 through42-14.5-3, which creates an Office of the Health Insurance Commissioner within the Department of Business Regulation, and endows it with the power of overseeing the health insurance industry in this State. The effective date of this act is contingent upon the appointment of a Health Insurance Commissioner, an event which had not yet taken place at the time of the Director's decision.
The General Assembly has also enacted a new statute specifically relevant to the administration of Blue Cross, at chapter 19.2 of title 27 of the General Laws ("chapter 19.2"), titled Nonprofit Hospital and Medical Corporations. In drafting the legislation the General Assembly expressly found:
 "it is in the best interests of the residents of Rhode Island:
 (1) To strengthen and reform the governance structure of nonprofit hospital service and/or medical service corporations;
 (2) To ensure a diverse, independent and publicly accountable board of directors;
 (3) To prohibit certain activities which may allow self-interest to compromise undivided loyalty to the public interest mission for which such corporations were established; and
 (4) To require adoption of principles and procedures to keep such corporations aligned with their public interest mission." Section 27-19.2-1.
In addition, the General Assembly identified several responsibilities of Blue Cross:
 "In accordance with their nonprofit hospital and/or medical service corporation mission, nonprofit insurers shall be required to:
(1) Offer products in the small group;
 (2) Offer products in the individual market, with at least one 30-day open enrollment period every twelve (12) months;
 (3) Employ pricing strategies that enhance the affordability of health care coverage; and
 (4) Protect the financial condition of the nonprofit hospital and/or medical service plan." Section 27-19.2-10
On September 10, 2004, Blue Cross filed new subscription rates for direct pay subscribers in Basic and Preferred rate groups, as well as rates for a new product for direct pay subscribers called BlueCHiP Direct. "Direct pay subscribers" are individuals who are not eligible for group coverage but instead purchase it directly, paying the entire cost themselves. (Ex. 28 at 1.) This class of insureds is comprised of approximately 9,200 subscribers and 13,000 members or insureds. (Tr. vol. I at 49.) Blue Cross is the sole offeror of individual health insurance in this State. Id. The Basic pool is made up of subscribers whose rates are determined by using community rates, while the Preferred pool consists of subscribers who have passed a health screening and whose rates are set based on the age and gender of the individual; Preferred rates are set at a range below and up to the amount of Basic rates. Id.
Blue Cross currently offers several benefit plans at different levels of coverage and different prices for both Basic and Preferred subscribers. (Ex. 27 at 4.) Its present filing seeks to raise the premiums it charges for each of these products. Blue Cross has also proposed to introduce a new insurance product for individuals, called BlueCHiP Direct, intended to be a closed-network product that would be available to all direct pay subscribers under the age of 65 at about 35% less cost than the proposed rates for Direct Blue Standard, which provides the most comprehensive coverage. (Ex. 27 at 6; Ex. 40 at 27.)
The increases Blue Cross now seeks are intended to address cost increases caused by greater projected hospital reimbursement, utilization/mix trends in Surgical/Medical, rising preferred prescription costs, and other increased costs. The proposed increases are as follows:
 Basic Rates (Pool I) Individual Family
 Subscribers Under Age 65
 Direct Blue Standard 16.8% 16.3%
 Direct Blue Economy 17.6% 17.5%
 HealthMate Direct 17.5% 17.6%
 Subscribers Age 65 and Over
 Direct Blue Standard 17.0% 16.5%
 Direct Blue Economy $500 17.7% 17.6%
 Preferred Rates[1] (Pool II) Individual Family
 Subscribers Under Age 65
 Direct Blue Standard 16.3% to 17.0% 16.3% to 17.0%
 Direct Blue Economy 17.2% to 17.6% 17.3% to 17.5%
 HealthMate Direct 17.0% to 17.9% 17.1% to 17.9%
Id. at 3. Blue Cross submitted various actuarial data, expense estimates and calculations, as well as written testimony from both James E. Purcell, the Acting President and Chief Executive Officer of Blue Cross ("Purcell"), and Michael J. Recorvits, the Chief Actuary of Blue Cross ("Recorvits") in support of the rate changes.
On October 22, 2004, the Director notified all counsel who had entered appearances in connection with the rate filing that it would be considering the effect of the provisions of chapter 19.2 and requested that interested parties address the issue. In re Blue Cross BlueShield of Rhode Island Petition for Increase of Rates for Class DIR, DBR No. 04-I-0144 at 2 (Nov. 23, 2004) [hereinafter In re Blue Cross]. The Attorney General responded in a filing titled Areas of Disagreement and Alternative Calculations on November 2, 2004. (R. Ex. 4.) After reviewing the filing and supportive evidence, the Attorney General did not challenge the calculations, but did object to the final percentage increases proposed by Blue Cross on the basis of affordability, stating that such a consideration was required by § 27-19.2-1. Id. at 1-2. The Attorney General requested that Blue Cross reduce its overall filed premium rate by one percent such that premiums would increase by between 15.1% and 16.7%. Id. at 2. Blue Cross responded by agreeing to the Attorney General's request but did not agree that any section of chapter 19.2 of title 27 was applicable to the rate filing. In addition, the Director received over one hundred and thirty letters and emails from the public, objecting to the proposed rate increases. (Ex. 48.)
A public hearing was held on November 5, 10, and 15, 2004. In re BlueCross at 3. Recorvits and Purcell testified, Genevieve Martin ("Martin") spoke on behalf of the Attorney General, and approximately thirty private citizens offered comments over the course of the three dates. Id.
Prior to the public hearing, the Attorney General's actuary had reviewed the rate filing. (Tr. vol. I at 51.) Martin testified regarding the actuary's report, noting that the rate increase would result in $52 million dollars in additional income in a year, most of which would be allocated to claims payment, while $4.5 million would pay administrative costs. Id. at 52. Martin stated that after reviewing the filing, the Attorney General's actuary determined that the rates requested by Blue Cross were supported by the information relating to claims and expenses provided Blue Cross. Id. at 65. "However," she noted, "everyone knows actuarially (sic) reasonableness does not equate to affordability." Id.
Citing chapter 19.2, she noted that the General Assembly had recently declared that Blue Cross must "employ pricing strategies that enhance the affordability of health care coverage." Id. Thus, the Attorney General challenged the filing based on its affordability and requested that Blue Cross reduce its filed rates by one percent, approximately $519,000 of the entire annual increase. Id. at 66.
Blue Cross, through its attorney Normand Benoit ("Benoit"), presented evidence that in the past, direct pay rates had generally increased on an annualized basis at 6.8 percent a year, but that over the last five years, the increase had been about 12.8 percent annually. Id. at 85. Benoit stated that these increases were in line with increases to group rates. Id. According to Benoit, health insurance premiums have increased faster than other cost of living indices and Social Security benefits because medical inflation has gone up more rapidly than general inflation. Id. Blue Cross had nonetheless attempted to address the affordability of its direct pay products, Benoit said. Id. at 87. One strategy he mentioned was offering plans with higher upfront deductibles but lower premiums. Id. Similarly, in the course of the present rate filing, Blue Cross was seeking approval of a new product with more limited benefits, called BlueCHiP, the premium for which would be approximately thirty-five percent lower than Direct Blue Standard (the most comprehensive coverage). Id. at 88. In addition, Blue Cross increased emergency room co-pays from twenty-five dollars to one-hundred dollars in order to discourage the use of expensive facilities for routine medical problems. Id. See also Id. at 154 (Recorvits testified to essentially the same information). However, Benoit stated that in the end, "[t]he affordability really needs to be addressed in other forums, I would suggest either the Legislature or elsewhere, state or local." Id.
at 91. He asserted that other insurance carriers do not offer direct pay insurance because they can't make money on it, noting that the direct pay area "has not been profitable over the years." Id. Finally, Benoit argued that the reason Blue Cross had agreed to the Attorney General's request that it lower its filed rates by one percent was that by cutting short the public hearings and deliberations on the rate filings, it would save additional actuarial costs, legal costs, and appeal costs, the expenses of which are ultimately borne by the subscribers. Id. at 93-94.
When asked directly by one of the co-hearing officers how Blue Cross had employed pricing strategies to enhance the affordability of health insurance, Benoit reiterated the above statements, citing the HealthMate and BlueCHiP products, increases in emergency room deductibles, and that "kind of thing." Id. 102. He was then asked how, if at all, a denial of the rate increases might affect the solvency of Blue Cross, but he did not answer directly. Id. at 103. Instead, Benoit explained that each class of insured must be self sustaining; to institute a community rating instead would cause rates for younger, healthier people to dramatically increase, leading in turn to those subscribers dropping out of the community, and leaving only older, sicker people.[2] Id. at 105. Furthermore, Benoit asserted that talking about affordability in concrete dollars and cents terms would lead to a slippery slope because there would always be someone who could not afford the premium, regardless of how low it was. Id. at 106.
Recorvits also testified for Blue Cross at the public hearing. He was asked whether Blue Cross has considered rating the direct pay class of subscribers with other classes as a way of enhancing affordability. Id.
at 118. His reply was that Blue Cross had not done so, that if it were required to do so or chose to do so, it might find that Blue Cross would be less competitive in the group insurance market. Id. When asked whether the corporation had conducted any studies or could produce evidence supporting that statement, Recorvits responded that no, Blue Cross had nothing of that nature to present. Id. at 119. The hearing officer also asked Recorvits whether Blue Cross had ever considered changing the age increments by which it sets premiums. Id. at 134. Recorvits said that Blue Cross had not. Id.
The issue of corporate reserves was addressed by Purcell. He testified that it was the longstanding policy of Blue Cross to require that each class of subscribers contribute a proportionate share toward the corporate reserves. (R. Ex. 40 at 22.) This practice, he noted, had been upheld in the past, both by the Director and the Rhode Island Supreme Court. Id. at 23. Purcell stated that Blue Cross seeks to accumulate a reserve fund equal to 22% of annual premium. Id. at 25. As of July 1, 2004, the reserve level was 17.8%, or $281 million. (Tr. vol. III at 15.) Purcell testified that the direct pay class had a reserve deficit of $1,129,982 as of June 30, 2004. Id. If the rate filing were to be approved in full, he stated, this would moderately improve, but the increase was essentially a "break-even filing." Id. at 26. Purcell stated that because direct pay subscribers do not contribute to the reserves, other classes of subscribers must make up that amount. Id. at 22. He argued that this is not consistent with the public interest because it drives other classes' rates up, making Blue Cross less competitive. Id.
Over the three days of the hearing, approximately thirty subscribers put their comments on the record. Jane Mayer stated that in the three years that she had had Blue Cross health insurance, her premiums have increased by over seventy percent. (Tr. vol. I at 13.) William Greenwood stated that "we just can't afford [the premiums] anymore. We're going broke." Id. at 41. Joanne Cece said "I've had an increase every year since I've started with Blue Cross. My husband is self-employed, and it's a struggle as it is now to make the payment every month." Id. at 42. Joan Plaziak expressed concern for how she and her ninety-three year old mother would pay the premiums, asking "[w]hat do you do if you don't have it? Do I take the money away from my mother for food, whatever we have?"Id. at 43. Deborah Cavanagh emailed comments to the Director, stating that she and her family are in danger of being unable to afford any health insurance, and that they have considered going without it. (R. Ex. 48 at 1.) Another email, signed "Karen," stated that the author would be forced to go without health insurance if premiums increased again.Id. at 7. Alice R. Graham, a sixty-three year old retired school teacher, stated, "I don't know what to do as I cannot afford this proposed increase. I am having a hard time paying your present rates."Id. at 35. These comments reflect the uniform opposition by direct pay subscribers to the proposed increases, on the basis that the rates are becoming unaffordable. (Tr. vol. I at 47.)
In a thirty-five page decision, the Director found that Blue Cross failed to show that its rate filing was consistent with the proper conduct of its business because the rates proposed were not affordable and that because they were not affordable, the management could not simply continue its practice of requiring the direct pay class to be self-supporting without reexamining that practice. In re Blue Cross at 18. Blue Cross's "belief" that changing the structure of rates so that direct pay subscribers would not have to be self-sustaining, the Director found, was insufficient to satisfy the statutory standard set forth at §§27-19-6 and 27-20-6 in light of newly enacted chapter 19.2. Id.
Moreover, the Department noted that all of the claimed approaches to enhancing affordability cited by Blue Cross's representatives had been in place before chapter 19.2 was enacted; no new efforts to enhance affordability had been made. Id. at 19-20.
In rendering her decision, the Director concluded that the General Assembly's intent in enacting chapter 19.2 was to require Blue Cross to conduct its operations in a manner that would reflect the fundamental differences between the purposes and objects sought to be achieved by a for-profit corporation and a non-profit corporation. In statutory terms, the Director concluded that what is "proper conduct" of a for-profit corporation is not necessarily "proper conduct" of a non-profit corporation. In re Blue Cross at 29. Rejecting the rate filing in its entirety, the Director set forth the minimum showing that Blue Cross must make to satisfy the statutory standard for a rate increase. The Director concluded that to sustain its burden, Blue Cross must prove that it has taken all steps to offer their direct pay products at rates that enhance affordability, pursuant to § 27-19.2-10. In re Blue Cross at 27. Specifically, Blue Cross must show that it has considered modification of age categories, modification of family composition tiers, modification of the rate design to share part of the cost of the direct pay class with other classes, along with specific evidence showing whether and to what extent the approach would affect its group products, and utilizing part of the reserves to subsidize the costs of direct pay. Id. at 27-28. In addition, the Director would require Blue Cross to justify each and every administrative expense, indicate how the appellant had identified factors that would drive costs up, and how additional revenue would be spent.Id. at 29. In sum, the Director concluded that Blue Cross was not conducting its business in a manner evidencing "principles and procedures to keep [it] aligned with [its] public interest mission." Section27-19.2-1.
 STANDARD OF REVIEW
The standard of review to be applied in an appeal from a decision of the Director of the Department of Business Regulations is set forth at §42-35-15(g):
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflictof Interest Comm'n, 509 A.2d 453, 458 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. of Employment Security, 414 A.2d 480, 482
(R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Mgmt.Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody,509 A.2d at 458.
When reviewing an agency's construction of a statute, the Court's goal is to give effect to the General Assembly's intent. Martone v. JohnstonSch. Comm., 824 A.2d 426, 431 (R.I. 2003). In the case of a clear and unambiguous statute, the Court must construe it will be literally. Id.
"If, however, [the Court is] given the task of interpreting a statute that is susceptible to more than one interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference." Id. (citing Asadoorian v. Warwick Sch. Comm., 691 A.2d 573,578 (R.I. 1997)). "Indeed, even when the enabling provision(s) empowering an agency to adopt regulations is unclear, [the Court is] required to accord great deference to the agency's interpretation of its authority to act." In re Advisory Opinion to the Governor, 732 A.2d 55, 76 (R.I. 1999). Unless an agency's interpretation of a statute as applied to a particular factual situation is clearly erroneous or unauthorized, this Court must defer to the agency. Labor Ready Northeast, Inc. v.McConaghy, 849 A.2d 340, 344 (R.I. 2004).
 ANALYSIS
The appellant asserts that the present appeal turns on a single question of law, specifically, the validity of the Director's construction and application of chapter 19.2. Blue Cross asserts that the enactment of chapter 19.2 did nothing to affect the standard for approval of new rates set forth at §§ 27-19-6, and 27-20-6, which require that the rates be "consistent with the proper conduct of its business and with the interests of the public." Contending that the rate increase proposed was "actuarially unassailable," Blue Cross asserts that the Director improperly rejected it. In addition, the appellant argues that by rejecting the rate filing, the Director has also rejected Blue Cross's traditional rating methodology and "arrogated unto itself the `highly charged policy decision' to force rate subsidies between classes," thereby exceeding its authority.
The Director contends that its interpretation of how the new provisions of chapter 19.2 should be applied to rate setting standards is correct. Furthermore, the Director argues, its decision does not force rate subsidies, but simply requires Blue Cross to demonstrate that it considered different pricing strategies designed to enhance affordability when filing new rates.
As suggested by both of the parties, the threshold issue before the Court is a question of law, specifically, whether the Director properly applied the statutory standard set forth at §§ 27-29-6 and 27-30-6 in light of chapter 19.2 in reviewing Blue Cross's rate filing. Pursuant to §42-14-2, the Director is vested with the authority to regulate and control insurance. The Director is required by statute to carry out the provisions of chapters 1 through 36 of title 27, which would obviously encompass chapter 19.2. Section 42-14-1. As the General Assembly is presumed to know the state of the law when it enacts legislation, P.J.C.Realty v. Barry, 811 A.2d 1202, 1206 (R.I. 2002), it follows that the legislature intended the Director to implement the provisions of the new chapter 19.2 in accordance with its authority under § 42-14-1. Principles of statutory interpretation support this conclusion; to conclude that the Director has no authority to implement chapter 19.2 would be to impermissibly render its provisions mere platitudes. See State v.Santos, 870 A.2d 1029, 1034 (R.I. 2005) (citing Kingsley v. Miller,120 R.I. 372, 376, 388 A.2d 357, 360 (1978) ("This court will not ascribe to the General Assembly an intent to enact legislation which is devoid of any purpose, inefficacious, or nugatory")). According the requisite deference to the interpretation of the Director, this Court concludes that the provisions of chapter 19.2 are enforceable by the Director and are relevant to the case before the Court. The General Assembly's intent in drafting chapter 19.2 is express and leaves no room for doubt: the legislature declared it to be in the best interest of Rhode Island residents that Blue Cross as an entity be reformed and that it be kept in alignment with its public interest mission. Section 27-19.2-1. The Director's conclusion that chapter 19.2 impacts its review of rate filings is therefore reasonable and must be affirmed.[3]
Moreover, any decision by the Director to alter Departmental policy by rendering the standard that Blue Cross must meet more stringent is well within the Director's authority. "An agency is always free to change its policy," provided that the new policy is within its authority, made pursuant to proper procedure, and the agency provides an explanation for the change. Richard J. Pierce, Jr., Administrative Law Treatise, § 3.3 at 147 (2002) (collecting cases). The Director's policy change is based on a reasonable interpretation of the newly enacted chapter 19.2, by which the Director is bound and which he must enforce. The Director's interpretation of "the proper conduct of its business and the interests of the public," as an ambiguous term, is entitled to deference. See Kayv. North Lincoln Hospital Dist., 555 F. Supp. 527, 530 (D. Or. 1982) (noting that "proper conduct" is an ambiguous term). In addition, the Director clearly articulated its reason for this policy shift — that in light of the rapidly climbing cost of individual health insurance, as well as recent controversies involving the administration of the Blue Cross corporation and the legislature's ensuing decision to implement certain reforms, the Director could not simply permit Blue Cross to continue "business as usual" to the detriment of the public it was created to serve. Any such reasonable change in policy by the Director is within its authority. See Smiley v. Citibank, 517 U.S. 735, 742 (1996) (an agency's decision to change a policy is valid if not arbitrary, capricious, or an abuse of discretion).
Blue Cross next asserts that the Director has exceeded its authority in relying on the principles set forth in chapter 19.2 to require the appellant to change its decades-old rating structure by mandating that group insurance subscribers be made to subsidize the cost of insuring individuals. The appellant's characterization of the decision is inaccurate. As noted above, the Director found that Blue Cross had failed to sustain its burden of proof as to the two part standard: consistency with the proper conduct of its business and consistency with the public's interest. The Director issued no directive that would require Blue Cross to restructure its rates according to a certain formula. Rather, it simply directed Blue Cross to reexamine its rate structure to ensure compliance with chapter 19.2.
Blue Cross's reliance on the Rhode Island Supreme Court's decision inBlue Cross and Blue Shield of Rhode Island v. Caldarone, 520 A.2d 969
(R.I. 1987) is therefore misplaced. Caldarone involved Blue Cross's proposal to increase rates for Plan 65, an insurance plan designed to supplement federal Medicare benefits. Id. at 970. Blue Cross had proposed to increase rates such that a projected deficit in Plan 65's funding would be made up, and a reserve totaling over one million dollars would be established. Id. The Director rejected the increase to the extent that it was intended to reduce the deficit or fund the reserve. Id.
In its review, the Rhode Island Supreme Court focused on the statutory mandate that Blue Cross maintain, at a minimum, funds equal to the claims and operating expenses for one half of a month. Id. Although the court noted that Blue Cross was required to maintain total reserves (as opposed to separate reserves for each class of rate payers) in that amount, because unrebutted evidence had shown that both the total corporate reserves and the reserve for Plan 65 were well below the required minimum, the court held that the Director's decision would unlawfully require Blue Cross to operate in violation of §§ 27-29-6 and 27-30-6.[4]Id. In addition, the Supreme Court noted that the Director had, in a 1979 decision, remarked unfavorably upon a proposal to allow Plan 65 rate to pay for less than its costs. Id. The Supreme Court held that the Director could not depart from prior decisions regarding business practices without probative evidence indicating that such a departure was warranted and in the public interest.
Blue Cross asserts that Caldarone stands for the proposition that it cannot be required to abandon its segregated class system. However, the appellant's analysis ignores the fact that the Supreme Court left open the possibility that the director could depart from prior rate decisions if such a departure were based on sufficient evidence. The Caldarone court had simply found that it was
 "unreasonable for the director, without any probative evidence before him to suggest the change, to depart from the prior decisions on this point that still appear to be based on sound business practice, sound accounting and actuarial principles that, on the record before us, appear to be in the public interest." Id. at 973.
The Court concludes that the Director's rejection of Blue Cross's rate filing is consistent with both this language and an earlier Rhode Island Supreme Court decision, Hospital Service Corp. of Rhode Island v.West, 112 R.I. 164, 308 A.2d 489 (1973), in which the court had also reviewed a proposed rate increase for Plan 65. In West, several senior citizens' groups had opposed the rate increase because they claimed it was not affordable. Id. at 169, 492-93. In considering the request, the Director concluded that granting the increase would not be in the interest of the public because the increases would render Plan 65 premiums too expensive. Id. at 169, 493. The Director denied the requested 15.75 % increase, but authorized a 5.25% increase, sufficient to make Plan 65 self-sustaining but not enough to establish an independent reserve. Id. The Director reasoned that because evidence at the hearing had indicated that Blue Cross had, as a whole, substantial reserves, there was no need to have a separate reserve for Plan 65. Id. at 170, 493. On appeal, the trial justice in the Superior Court upheld the Director's decision. Id. at 171, 493.
In reviewing the Superior Court's decision, the Supreme Court first addressed the question of whether Blue Cross had sustained its burden of proving that the rates proposed to be charged were consistent with the interests of the public. Id. at 174, 495. The Supreme Court rejected Blue Cross's argument that by demonstrating that proposed rates were "consistent with proper conduct" it automatically proved that they were consistent with the public interest, reasoning that if the Legislature had intended that proof of one prong could satisfy both, it would have expressed that intent. Id. Moreover, the court held, conflating the two prongs of the statutory standard would
 "substantially deregulate the establishment of Blue Cross-Blue Shield rates and would reduce the Director of Business Regulation's function to ascertaining the mathematical accuracy of rates already determined to be appropriated by the applicants' boards of directors and actuaries. This would deprive the director of the power to regulate rates to protect public interest and would be contrary to the spirit and language of §§ 27-19-6
and 27-20-6, which expressly vest him with power to `approve, disapprove, or modify' the proposed rates." Id. at 174, 495.
The Supreme Court upheld the trial justice's denial of the proposed 15.75 % rate increase and the Director's finding that a premium increase beyond that which was essential to make Plan 65 self-sustaining was inconsistent with the interests of the public, equating such finding with a finding that the proposed rate increase was arbitrary and unreasonable. Id., 176, 495.
Both the facts of West and Blue Cross's arguments in that case bear marked similarities to the instant matter. Just as in West and unlike in Caldarone, Blue Cross today possesses substantial reserves but nevertheless seeks a large rate increase to supplement its surplus funds. Blue Cross argues that its present rate increase is based on sound business practices, accounting, and actuarial principles, and continues its standing practice of requiring different classes of subscribers to be self-sustaining — all of which have previously been approved by the Director — and which, it claims, are consistent with the proper conduct of its business and thus consistent with the public interest. Further, it asserts, there is no evidence on the record to contradict Blue Cross's evidence that the rates are proper. Essentially, Blue Cross advances the same argument rejected by the Supreme Court in West, that because the increase is mathematically accurate and actuarially justified, it is consistent with the public's interest.
In analyzing the effect of chapter 19.2 on the two-prong rating standard, the Director construed chapter 19.2 as defining what the "proper conduct" of Blue Cross's business should be. Blue Cross at 8. Proper conduct, the Director determined, entailed carrying out its charitable mission of providing "affordable and accessible health insurance to a comprehensive range of consumers, including business owners, employees and unemployed individuals." Id. at 9 (citing §§ 27-19.2-3
and 27-19.2-10. Citing public comment, the Director determined that the rates set by Blue Cross for direct pay customers were not affordable. Id. at 10. The Director concluded that the pricing strategies that Blue Cross had employed, including delaying rate increases, not allocating certain expenses to direct pay subscribers, and similar measures did not satisfy the requirement that insurance be made affordable or that affordability enhancing strategies be advanced. Id. at 12.
This Court finds that the Director's construction of chapter 19.2 is reasonable and entitled to deference. Section 27-19.2-10 states that Blue Cross shall be required to enhance affordability as part of its nonprofit mission; § 27-19.2-3 sets forth Blue Cross's mission, one aspect of which is to provide affordable health insurance. The Director's finding that Blue Cross had not proven that the rates were in fact affordable is supported by reliable, probative, and substantial evidence, specifically, the public comments of Blue Cross subscribers. Similarly, the Director's finding that Blue Cross did not show that it had taken the effect of the rates on the unemployed into consideration is supported by the record, as there is no significant reference to the issue in the record. The Director's finding that Blue Cross did not show that a denial of the proposed rate increase would adversely affect the appellant's financial solvency is also supported by the record, which contains testimony indicating that Blue Cross is presently maintaining approximately $281 million in reserves. (Tr. vol. III at 15.)
In addition, the Director concluded that Blue Cross had not proven that the proposed rate design appropriately addressed affordability. The record indicates that at the public hearing, attorney Benoit stated that while some price lowering measures had been attempted, Blue Cross had not looked into altering its rating methodology. (Tr. vol. I at 91.) Similarly, Recorvits testified that Blue Cross had never considered rating the direct pay class of subscribers with other classes as a way of enhancing affordability. Id. at 118. The reliable, probative, and substantial record evidence supports the Director's finding that Blue Cross did not consider affordability in designing its rating structure.
Because the Director found that the appellant did not make an adequate showing that its proposed rates were affordable or even that it had attempted to make the rates affordable, it rejected Blue Cross's filing as a whole. As these conclusions are not clearly erroneous and supported by competent record evidence, they must be affirmed.
Blue Cross contends that the cost of health insurance and the issue of affordability are problems that are too large to be addressed in the context of a rate filing. It should, Blue Cross argues, be addressed "by the legislature or elsewhere, state or local," in other words, by anyone but the appellant. The Court concludes that the State legislature has in fact addressed the issues of cost and affordability by delegating to the Department of Business Regulation the task of ensuring that Blue Cross conducts its business properly, in a manner consistent with the interests of the residents of this State. Such tasks are routinely delegated to administrative agencies because of the superior ability and expertise of an agency to adjudicate complex issues such as the propriety of health insurance rates. See,e.g., Johnston Ambulatory Surgical Assocs. v. Nolan,755 A.2d 799, 817 (R.I. 2000) (noting the expertise of the administrative agency in knowing and understanding the factors affecting the public's needs); see alsoVerizon New England Inc. v. Rhode Island PublicUtilities Comm'n., 822 A.2d 187, 193 (R.I. 2003) (noting the delegation of complex matters of law to administrative agencies)
The Director also concluded as a matter of law that newly-enacted § 42-14.5-3(b) conferred upon it the authority to review each of Blue Cross's administrative costs for reasonableness. Section 42-14.5-3(b) relates to the powers and duties of the Health Insurance Commissioner. The Director acknowledged that the statute was not yet effective but expressed a belief that "the standards and directives in the statutes show a clear intent upon the part of the legislature that the Director has the power and duty to inquire into and make orders regarding administrative expenses" until the Director's jurisdiction over the rates is transferred upon appointment of a Health Insurance Commissioner. Inre Blue Cross at 22 n. 18.
If, in drafting statutes to be administered by an agency, the legislature explicitly leaves a gap for the agency to fill with its own interpretation, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute"; the legislature may also implicitly delegate the construction of a statute to an agency where a statute's ambiguity makes construction necessary. Chevron U.S.A.v. Natural Resources Defense Council, 467 U.S. 837, 843-44
(1984). By implication, if the legislature does not leave a gap or make an implicit delegation, it has precluded an administrative agency from construing a statute. Section 42-14.5-3 expressly delegates authority to the Health Insurance Commissioner to require "maximum disclosure . . . regarding the reasonableness of individual administrative expenditures as well as total administrative costs." The statute leaves no gap for the Director to fill by appointing itself to perform that function, even on an interim basis. See Succar v.Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) ("If a court, employing traditional tools of statutory construction, ascertains that [the legislature] had an intention on the precise question at issue, that intention is the law and must be given effect.") The Director's conclusion of law to the effect that it is consistent with the legislative intent of § 42-14.5-3 that the Department of Business Regulation require the appellant to provide detailed information and justification for all administrative expenses is therefore clearly erroneous and unauthorized. See Alliance to Protect NantucketSound, Inc. v. United States Dep't of the Army, 398 F.3d 105
(1st Cir. 2005) (declining to defer to an agency's interpretation of a law it found to clearly express legislative intent). The Director's conclusion on that point is affected by error of law and accordingly is reversed.
 CONCLUSION
Both the Rhode Island General Assembly and the Rhode Island Supreme Court have recognized that there is a "a substantial difference between the purposes and objects sought to be achieved by the statutes authorizing the creation of nonprofit hospital and medical service corporations and those authorizing the organization of commercial carriers." West, 112 R.I. at 178-79,308 A.2d at 497. The two-prong standard provided by the General Assembly for assessing the propriety of rates set by Blue Cross is designed to guarantee that a public need for affordable health insurance will be served.Id.
In its reasonable interpretation of the statutes it has been authorized to administer, the Director of the Department of Business Regulation has recognized these principles and found that the rate increase proposed by Blue Cross is not consistent with the proper conduct of its business or the public interest. That decision is supported by the reliable, probative, and substantial evidence of record. Although the Director's conclusion is that it is authorized to require Blue Cross to justify each and every administrative expense is erroneous, such conclusion has not prejudiced substantial rights of the parties, and is not material to the Director's rejection of the proposed rates. The decision of the Director, rejecting the rate increases, is accordingly affirmed. Counsel shall submit an appropriate order, consistent with this decision.
[1] Because Pool II premiums vary by age and gender, a range of rate changes was provided. (Ex. 28 at 3.)
[2] This argument is slightly disingenuous considering that younger, healthier direct pay subscribers have no more choice in their health insurance provider than older, sicker ones do; only Blue Cross offers insurance to individuals.
[3] Blue Cross asserts that the Department attempted to "bootstrap" its interpretation of chapter 19.2 by relying on correspondence from State legislators supporting the Department's interpretation. Blue Cross asserts that the Department's reliance on this correspondence was improper because statements by individual legislators could not, under Rhode Island law, constitute evidence of legislative intent.
Blue Cross's reliance on LaPlante v. Honda NorthAmerica, 697 A.2d 625, 628-29 (R.I. 1997) is well-placed, and following the holding in that case, this Court concludes that no weight should have been given to the "recollections" of individual legislators as to the General Assembly's intent. However, such error is not grounds for reversal; only if the letters had been the sole basis for the Department's findings could this Court reverse. Milardo v. Coastal Resources Mgmt.Council, 434 A.2d 266, 272 (R.I. 1981).
[4] Evidence in the record had demonstrated that total corporate reserves had in fact fallen to approximately three days, or as of June 30, 1985, less than $3 million.